**Corrected Exhibit A to Joint Motion for Preliminary Approval of Class Settlement and Proposed Class Notice**

**Settlement Agreement**

## SETTLEMENT AGREEMENT

This Settlement Agreement (inclusive of all Exhibits) dated July 27, 2006, is between General Motors Corporation ("GM"), the IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC ("IUE-CWA") and the Class Representatives on behalf of all Class Members in the class action styled *IUE-CWA, et. al. v. General Motors Corporation*, Civil Action No. 2:06-cv-12151 (E.D. Mich.) ("the lawsuit") and is binding on GM, the IUE-CWA and all Class Members.

GM maintains that to remain viable and competitive it must, among other things, reduce its health care obligations. GM is the largest private purchaser of health care in the United States, and more than two-thirds of GM's health care expenditures go to its retiree participants. GM maintains that this health care burden impacts both its financial position and market competitiveness. In addition, GM's health care costs have been an important factor in the financial market's decision to downgrade GM's corporate credit ratings. The IUE-CWA and Class Counsel have reviewed GM's current and projected financial condition, as well as information concerning GM's retiree health care costs, and, as a result, have concluded that, among other things, a significant reduction in GM's retiree health care costs under the existing plans is likely to substantially improve its financial condition. Without improvement, the ability of GM to provide health care benefits over the long term at or near the level provided by this Settlement Agreement would be placed in doubt.

While GM believes it has the right to unilaterally modify and/or terminate retiree health care benefits, GM acknowledges that there are risks and delays inherent in any litigation on an issue of this nature. Similarly, GM acknowledges that if it acted unilaterally, such action would bring about a significant deterioration in GM's relationship with the IUE-CWA, its employees, and retirees, and that in such event, efforts to jointly work together to make plants and operations more efficient and productive would be harder to achieve. While the IUE-CWA and Class Representatives believe that GM does not have the right to unilaterally modify and/or terminate retiree health care benefits to Class Members, they too acknowledge that there are risks and delays inherent in any litigation on an issue of this nature and that a compromise as reflected by this settlement is preferable to the possibility of an unfavorable outcome to the litigation.

This Settlement Agreement resolves and settles all claims that arise in connection with the class action for the period covered by this Settlement Agreement. This Settlement Agreement is subject to approval by the Court and other terms and conditions as set forth herein. In the event of an inconsistency between this Settlement Agreement and any prior agreements or documents, including the Term Sheet, this Settlement Agreement shall control. This Settlement Agreement provides for the amendment of the General Motors Health Care Program For Hourly Employees. However, nothing in this Settlement Agreement is intended to alter the eligibility provisions of the General Motors Health Care Program For Hourly Employees or to expand GM contributions or to provide benefits to individuals who are not otherwise entitled to such under such Program.

1.        **Principal Definitions**

Active Employees.  The term "Active Employees" shall mean those hourly employees of GM who, as of the April 28, 2006 Ratification Date or any date thereafter, are covered by the 2003 GM-IUE-CWA National Agreement or are covered by any subsequent GM-IUE-CWA National Agreements.

Actual OPEB Trend Rate.  The term "Actual OPEB Trend Rate" shall mean a percentage figure determined by comparing the two 12-month periods from January 1 to December 31st preceding August 1st of the year prior to the Catastrophic Plan Escalation (e.g., at August 1, 2006, the Actual OPEB Trend Rate to be applied for the 2007 Catastrophic Plan Escalation will be a percentage figure determined by comparing 2005 calendar year actual experience to 2004 calendar year actual experience). The "Actual OPEB Trend Rate" will be calculated by GM's health care actuary and will be provided to the IUE-CWA annually with an appropriate level of supporting detail.  The Actual OPEB Trend Rate will be based on actual aggregate incurred claims for hourly retirees for the most recent calendar year preceding August 1 of the year prior to the Catastrophic Plan Escalation, divided by the actuarially expected incurred claims for the same calendar year using the prior year's actual claims costs, less 1.0, and converted to a percentage.  Actuarially expected incurred claims for the same calendar year using prior year's actual claims costs will be calculated by multiplying the demographic census for the current year by the actuarially determined, age based, per capita incurred claims costs (as determined by GM's health care actuary for the Financial Accounting Standard 106 actuarial valuation) for the prior year.  Actual incurred claims experience is measured using at least 15 months of paid claims data for the incurred calendar year plus an actuarially developed estimate for final actual claims payment run-out.  Claims experience represents the aggregate claims for medical, prescription drug, and vision benefits. For this purpose, actual aggregate incurred claims for the calendar year shall reflect the effect of the Catastrophic Plan Escalation for that year. Adjustment in actuarially expected claims associated with plan design changes shall be made in a manner consistent with the methodology used to recognize plan design changes under Financial Accounting Standard 106.

Administrative Changes.  The term "Administrative Changes" shall mean those plan design changes set forth in Exhibit 1.

Admission.  The term "Admission" shall mean any statement, whether written or oral, any act or conduct, or any failure to act, that could be used (whether pursuant to Rules 801(d)(2) or 804(b)(3) of the Federal Rules of Evidence, a similar rule or standard under other applicable law, the doctrines of waiver or estoppel, other rule, law, doctrine or practice, or otherwise) as evidence in a proceeding as proof of agreement with another party's position or as proof of adoption of, or acquiescence to, a position that is contrary to the  interest of the party making such statement or taking such action.

Affordability Test.  A Class Member who is a GM retiree or surviving spouse shall be deemed to meet the "Affordability Test" and be considered a Protected Retiree if, based on the calculations and qualifications set forth in Section 5 of this Settlement Agreement, such person is (a) entitled to an annual GM pension benefit income under the Pension Plan of $8,000 or less, *and* (b) receives a pension under the Pension Plan calculated based on a monthly Basic Benefit

Rate (as established in Article II, Section 4(a)(1) or Article II, Section 8(a)(1) of the Pension Plan as applicable) of $33.33 or less per year of credited service, or, in the case of a surviving spouse, a pension Basic Benefit Rate reduced as set forth in Article II, Sections 5(e) and (f) of the Pension Plan.

Catastrophic Plan.  The term "Catastrophic Plan" shall mean a new GM health care plan for catastrophic health care expenses as described in Exhibit 2 and in Section 4 of this Settlement Agreement.

Class or Class Members.  The term "Class" or "Class Members" shall mean: all persons who, as of the April 28, 2006 Ratification Date, were (a) GM-IUE-CWA hourly employees who had retired from GM with eligibility to participate in retirement in the Original Plan, or (b) the spouses, surviving spouses and dependants of GM-IUE-CWA hourly employees, who, as of the Ratification Date, were eligible for post-retirement or surviving spouse health care coverage under the Original Plan as a consequence of a GM-IUE-CWA hourly employee's retirement from GM or death prior to retirement.  Active Employees are not members of the Class.

Class Counsel.  The term "Class Counsel" shall mean William T. Payne, 1007 Mt. Royal Boulevard, Pittsburgh, PA   15223, and John Stember and Edward Feinstein of the firm STEMBER FEINSTEIN, 1705 Allegheny Building, 429 Forbes Avenue, Pittsburgh, PA 15219.

Class Representatives.  The term "Class Representatives" means Larry Combs, Eva Cox, Mary Davis, Lee Hill and Earl R. Williams as representatives of the Class or Class Members.

Code.  The term "Code" shall mean the Internal Revenue Code of 1986, as amended.

Co-insurance.  The term "co-insurance" shall mean an amount that an enrollee is required to pay to a provider for a covered service or supply when such amount is calculated as a percentage of the covered expense for the service or supply.

Co-payment.  The term "co-payment" shall mean a fixed-dollar amount that an enrollee is required to pay to a provider for a covered service or supply at the time the service or supply is provided.

Court.  The term "Court" shall mean the United States District Court for the Eastern District of Michigan.

Current Plan.  The term "Current Plan" shall mean the Original Plan.

Deductible.  Aggregate cost for medical services that must be borne by plan participant before plan coverage is applied.

ED Drugs.  The term "ED Drugs" shall mean Viagra, Levitra, Cialis and other drugs prescribed for treatment of erectile dysfunction.

Effective Date.  The term "Effective Date" shall mean the date upon which this Settlement Agreement goes into effect, which is when the conditions set forth in Section 16 have been satisfied.

Future Retirees.  The term "Future Retirees" shall mean (a) Active Employees who retire after the April 28, 2006 Ratification Date with eligibility for GM provided post-retirement health care coverage under the Current, Modified, or Catastrophic Plan; (b) the surviving spouses of the Active Employees noted in (a) who are eligible for surviving spouse health care coverage under such Plans; (c) the surviving spouses of Active Employees who are eligible for surviving spouse health care coverage under such Plans as a consequence of the Active Employee's death after the Ratification Date but prior to retirement from GM; (d) Delphi employees represented by the IUE-CWA who are "check the box" participants under paragraph 2 of the June 16, 2006 IUE-CWA-GM-Delphi Special Attrition Program and who retire after July 7, 2006 with eligibility for GM provided post-retirement health care coverage under the Modified or Catastrophic Plans; and (e) the surviving spouses of retired "check the box" participants noted in (d) if they are otherwise eligible for surviving spouse health care coverage under such Plans.

General Retirees.  The term "General Retirees" shall mean Class Members who are GM retirees or surviving spouses who (a) do not meet the Affordability Test, and (b) are enrolled in, and continue to meet all eligibility requirements for, the Modified Plan.

Implementation Date.  The term "Implementation Date" shall mean the date on or following the Effective Date when GM implements the Modified Plan and the Catastrophic Plan.

Judgment.  The term "Judgment" shall mean the final order or judgment entered by the Court approving an agreement between the parties in all respects as set forth in Section 16.B of this Settlement Agreement.

Modified Plan.  The term "Modified Plan" shall mean the Current Plan, as modified by the Administrative Changes set forth in Exhibit 1 to this Settlement Agreement and the other changes set forth in Section 3.A.2 of this Settlement Agreement.

Non-Participating Retirees.  The term "Non-Participating Retirees" shall mean Class Members who are GM retirees or surviving spouses who do not meet the Affordability Test and who either elect or default into coverage by the Catastrophic Plan.

Original Plan.  The term "Original Plan" shall mean the General Motors Health Care Program For Hourly Employees (Exhibit C-1 to the 2003 GM-IUE-CWA National Agreement) as in effect on the date of execution of this Settlement Agreement by the parties.

Pension Plan.  The term "Pension Plan" shall mean the General Motors Hourly-Rate Employees Pension Plan.

Plan Administrator.  The term "Plan Administrator" shall mean the entity defined as such in the Original Plan.

Protected Retirees.  The term "Protected Retirees" shall mean Class Members who are GM retirees or surviving spouses who meet the Affordability Test as set forth in Section 5 of this Settlement Agreement.

Ratification Date.  The term "Ratification Date" shall mean April 28, 2006, the date on which the IUE-CWA advised GM that Active Employees ratified the amendment of the General

Motors Health Care Program For Hourly Employees and the referenced changes to the 2003 GM-IUE-CWA National Agreement as reflected in the Term Sheet.

Term Sheet.  The term "Term Sheet" shall mean the April 10, 2006 term sheet between GM and the IUE-CWA entitled "IUE-CWA Health Care Discussions."

**2.    Future Retirees**

Future Retirees will receive their retiree health care benefits in accordance with the terms of this Settlement Agreement and will participate as Protected Retirees, General Retirees, or Non-Participating Retirees, in the Current Plan, the Modified Plan or the Catastrophic Plan on the same basis as Class Members, subject to all the terms and conditions set forth in this Settlement Agreement.  With regard to participation in such Plans, all references to Protected Retirees, General Retirees and Non-Participating Retirees in this Settlement Agreement shall be deemed to include such Future Retirees.  For purposes of this Settlement Agreement, any reference to health care benefits to be provided hereunder to Class Members or Future Retirees shall be deemed to include such benefits provided to any of their respective spouses and dependents subject to all the terms and conditions of the applicable plan, including but not limited to eligibility requirements.  However, Active Employees are not members of the Class and nothing in this Settlement Agreement modifies the rights or obligations of GM or the IUE-CWA to negotiate health care benefits for Active Employees and Future Retirees upon the expiration of the 2003 GM-IUE-CWA National Agreement, or at any earlier time if GM and the IUE-CWA mutually agree in writing.  Any changes resulting from the subsequent negotiations will be applied only to those who retire after any such agreement is reached and will not otherwise affect the rights of Class Members hereunder or Future Retirees who retire prior to the time any such agreement is reached.

**3.    Modified Plan**

A.    Terms.  The terms and conditions of the Current Plan shall remain in full force and effect until the Implementation Date.  Upon the Effective Date, the terms of the Current Plan will be amended pursuant to this Settlement Agreement only as follows, such amendments to become effective as of the Implementation Date, except as otherwise indicated below.

1.    Administrative Changes

The Administrative Changes that are or will be implemented in connection with the Modified Plan are set forth in Exhibit 1.  As set forth therein, Administrative Changes will be incorporated into the Current Plan after the Effective Date.  The Current Plan with all of these Administrative Changes, as well as the modifications described below in Section 3.A.2, constitute the Modified Plan.

2.    Other Changes

The Current Plan will also be amended as provided in Sections (a) through (g) below.

(a)    *Monthly Contributions*.  Monthly contributions of $10 for individual participants and $21 for family participants are required (the "Contributions").

(b)     *Traditional Care Network (TCN) and Preferred Provider Organization (PPO) Deductibles*.  Deductibles are required of $150 per individual participant but subject to an aggregate limit of $300 per family.  Amounts paid as monthly Contributions, prescription drug co-payments, office visit co-insurance amounts, Durable Medical Equipment (DME)/Prosthetics & Orthotics (P&O), Mental Health/Substance Abuse (MHSA), dental and vision cost sharing and other Modified Plan sanctions or exclusions, such as MHSA beyond limits or outside of network do not apply to meeting deductible amounts.  If the Final Judgment as contemplated in Section 16.B is entered after January 1, 2007, the 2007 deductibles will be pro-rated to adjust for such partial calendar-year period.

(c)     *TCN and PPO Coinsurance*.  Except for office visits, co-insurance of 10% will be required if covered participants use in-network health care services and 30% if covered participants use out-of-network services.  Co-insurance for in-network office visits for TCN and PPO remains at 100% and 50% respectively.  Out-of-network office visits are not covered.

(d)     *TCN and PPO Out-of-Pocket Maximums*.  Out-of-pocket maximums will be established at $250 per individual participant but subject to an aggregate limit of $500 per family for use of in-network health care services, and $500 per individual participant but subject to an aggregate limit of $1,000 per family for use of out-of-network health care services.  If the Final Judgment as contemplated by Section 16.B is entered after January 1, 2007, the 2007 out-of-pocket maximums will be pro-rated to adjust for such partial calendar-year period.

For both in-network and out-of-network out-of-pocket maximum amounts, deductibles paid in accordance with Section 3.A.2(b), and co-insurance payments paid in accordance with Section 3.A.2(c) above, shall count toward the satisfaction of such out-of-pocket maximum amounts.  Amounts paid as monthly Contributions, prescription drug co-payments, office visit co-insurance amounts, Durable Medical Equipment (DME)/Prosthetics & Orthotics (P&O), Mental Health/Substance Abuse (MHSA), dental and vision cost sharing and other Modified Plan sanctions or exclusions, such as MHSA beyond limits or outside of network, shall not count toward satisfaction of such out-of-pocket maximum amounts.

(e)     *Emergency Room Co-payments*.  Co-payments are established at a co-payment rate of $50 per emergency room visit unless admitted.  The co-payments do not apply to meeting Modified Plan deductible amounts and do not apply to meeting Modified Plan out-of-pocket maximum amounts.  The co-payments apply regardless of whether the Modified Plan out-of-pocket maximum amount has been met.

(f)     *The Prescription Drug Co-payment Schedule for Class Members and Future Retirees* is revised as follows for TCN, PPO, and HMO.  For drugs purchased at retail, the co-payment is $7 for generic drugs and $12 for brand-name drugs, in each case for a prescription order or refill of a covered drug, up to a 34-day supply.  For drugs purchased by mail order, the co-payment is $14 for generic drugs and $22 for brand-name drugs, in each case for a prescription order or refill of a covered drug, up to a 90-day supply.  ED Drugs are subject to a $15 co-payment if purchased at retail (for a prescription order or refill of a covered drug, up to a 34-day supply) and $22 co-payment if purchased by mail order (for a prescription order or refill of a covered drug, up to 90-day supply).  The co-payments do not apply to meeting Modified Plan deductible amounts and do not apply to meeting Modified Plan out-of-pocket

6

maximum amounts.  The co-payments apply regardless of whether the Modified Plan out-of-pocket maximum amount has been met.

(g)   *HMO/PPO*.  In accordance with the terms of the Current Plan, General Retirees are offered optional HMO and PPO plans in certain geographic areas in accordance with the provisions governing such offerings.  Beginning on January 1, 2007, in accordance with the normal practice under the Current Plan, the IUE-CWA and GM will review HMO and PPO offerings, and, in that process, actions regarding non-performing HMOs and PPOs will be taken to achieve equivalent health care savings.  These actions could include but would not be limited to some combination of increasing the existing office visit co-payment, requiring additional monthly Contributions, dropping non-performing HMOs and PPOs in accordance with the provisions of the 2003 GM-IUE-CWA National Agreement, or other changes.

B.   Modified Plan Escalation:  For so long as this Settlement Agreement shall remain in effect, all dollar-denominated plan design items referenced in Section 3.A.2 (a), (b), (d), (e) and (f) above ("Indexed Amounts") will increase annually as of the beginning of each calendar year at 7% ("Modified Plan Escalation") and will be rounded to the nearest whole dollar amount in accordance with the Engineering Method of Rounding.

C.   Administration:  The administration of the Modified Plan shall be as defined in the Current Plan including all supplements, letters and memoranda attached thereto.  This includes the joint committee identified in Exhibit C, Section 4(d) of the 2003 GM-IUE-CWA National Agreement, and the miscellaneous letter for the Corporation-Union Committee on Health Care Benefits.  GM and the IUE-CWA will also continue to work with third party benefit administrators and other parties responsible for benefit plan administration to reduce administrative costs.

**4.   Catastrophic Plan**

A.   Terms:  The plan design for the Catastrophic Plan is described in Exhibit 2 to this Settlement Agreement, and includes, for example, higher deductibles, higher emergency room co-payments, and higher prescription drug co-payments than those required under the Modified Plan.  Except as specifically set forth in this Settlement Agreement or Exhibit 2, the terms of the Catastrophic Plan shall be the same as those provided under the Modified Plan.

For both in-network and out-of-network out-of-pocket maximum amounts, deductibles and co-insurance payments paid in accordance with Exhibit 2 shall count toward the satisfaction of such out-of-pocket maximum amounts.  Amounts paid as prescription drug co-payments, emergency room co-payments, office visit co-insurance amounts, Durable Medical Equipment (DME)/Prosthetics & Orthotics (P&O), Mental Health/Substance Abuse (MHSA), dental and vision cost sharing and other Catastrophic Plan sanctions or exclusions, such as MHSA beyond limits or outside of network, do not apply to meeting deductible amounts and shall not count toward satisfaction of such out-of-pocket maximum amounts.

For drugs purchased under the Catastrophic Plan, all co-payment levels for generic, brand, and ED drugs are set forth in Exhibit 2 of this Settlement Agreement.  The retail co-payment will apply to each prescription order or refill of a covered drug for up to a 34-day

7

supply, and the mail order co-payment will apply to each prescription order or refill of a covered drug for up to a 90-day supply. ED Drugs are subject to higher retail co-payments (for each prescription order or refill, up to a 34-day supply) and mail order co-payments (for a prescription order or refill, up to a 90-day supply). The co-payments do not apply to meeting Catastrophic Plan deductible amounts and do not apply to meeting Catastrophic Plan out-of-pocket maximum amounts. The co-payments apply regardless of whether the Catastrophic Plan out-of-pocket maximum amount has been met.

B.   <u>Catastrophic Plan Escalation</u>:  For so long as this Settlement Agreement shall remain in effect, all dollar-denominated plan design items referenced in the Catastrophic Plan as referenced in Exhibit 2 to this Settlement Agreement will increase annually as of the beginning of each calendar year at the lesser of (a) Actual OPEB Trend Rate, but not less than zero, or (b) 3% ("Catastrophic Plan Escalation") and will be rounded to the nearest whole dollar amount in accordance with the Engineering Method of Rounding used in the COLA calculation.

C.   <u>Termination</u>: GM may terminate the Catastrophic Plan and all coverage under it if this Settlement Agreement is terminated by GM or the IUE-CWA in accordance with the provisions of Section 17.

### 5.   Protected Retirees

The following calculations and qualifications shall apply when determining Protected Retiree status.

In all circumstances requiring a determination of the Basic Benefit Rate requirement for surviving spouses under this Settlement Agreement, such determination shall be based on the pension Basic Benefit Rate (established in Article II, Section 4(a)(1) or Article II, Section 8(a)(1) of the Pension Plan as applicable) as reduced for surviving spouses as set forth in Article II, Sections 5(e) and (f) of the Pension Plan. Such Basic Benefit Rate for surviving spouses will be utilized in addition to the requirement that they be entitled to receive an annual GM pension benefit income under the Pension Plan of $8,000 or less. Surviving spouses who receive no GM pension benefit because the GM retiree elected to waive surviving spouse coverage shall be deemed to meet the Affordability Test.

For any Class Members who are GM retirees or surviving spouses and for any Future Retirees who are participants in the GM Health Care Plan for Hourly Employees, when such Class Members and Future Retirees (a) are not in receipt of a GM pension benefit or (b) are in receipt of only a pro rata GM pension benefit, in either case due to a divestiture, the Delphi spin-off, or transfer from Saturn, the Basic Benefit Rate test is met if the GM Pension Plan Basic Benefit Rate that would otherwise be applicable to the participant is $33.33 or lower, and the annual GM pension benefit income test is met if combined divested unit, Delphi, and GM pension benefit income is $8,000 or less. For surviving spouses in receipt of multiple divested unit, Delphi, and GM pension benefits, the total of all such benefit payments will be included in determining the annual GM pension benefit income. Additionally, in order to meet the Affordability Test, all monthly Basic Benefit Rates must be below the specified level. If any one rate is above the level, then the person will be deemed to not meet the Affordability Test.

In determining the GM pension benefit income, the following are included: (i) for retirees, the Basic Benefit (as set forth in the Pension Plan) and any applicable supplement, temporary benefit or surviving spouse benefit; (ii) for surviving spouses, the Basic Benefit including Joint and Survivor Coverage, Retirement Equity Act (REA) benefits, contingent annuitant payments (for surviving spouses only 65% of contingent annuitant benefits will count toward meeting the test) and, if applicable, deferred vested benefit payments; (iii) all Salaried Retirement Program payments; (iv) for individuals subject to one or more Qualified Domestic Relations Orders (QDROs), the calculation will be based on the pension benefit amount as calculated in the absence of any QDRO (income received from QDROs will not be included in GM pension benefit income, unless it is income that would be received in the absence of the QDRO); (v) for individuals with a carve-out amount due to participation in the Saturn Individual Retirement Plan, the carve-out amount will be added back to the pension benefit amount to calculate the total GM pension benefit.  In determining the GM pension benefit income, the following are excluded: (i) lump sum payments; and (ii) Medicare Part B Special Benefit.

In cases where a GM retiree or surviving spouse has their benefits re-determined as a result of a retiree or spouses' death, marriage/remarriage, attainment of age 62 and 1 month or the 80% date, benefit increases, or other circumstances that require re-determination of a pension benefit, the determination of the Affordability Test shall be re-determined utilizing the monthly benefit in effect on the first date of the re-determination.

Health care coverage for Protected Retirees remains the same as it was under the Current Plan, with the following modifications.  First, health care coverage for Protected Retirees is subject to the Administrative Changes described in Section 3.A.1 of the Settlement Agreement. Second, with respect to TCN, PPO, and HMO, for drugs purchased at retail, the co-payment is $5 for generic drugs and $10 for brand-name drugs, in each case for a prescription order or refill of a covered drug, up to a 34-day supply.  For drugs purchased by mail order, the co-payment is $10 for generic drugs and $15 for brand-name drugs, in each case for a prescription order or refill of a covered drug, up to a 90-day supply.  ED Drugs are subject to a $15 co-payment if purchased at retail (for a prescription order or refill of a covered drug, up to a 34-day supply) and $18 co-payment if purchased by mail order (for a prescription order or refill of a covered drug, up to 90-day supply).  The co-payments do not apply to meeting Current Plan out-of-pocket maximum amounts.  The co-payments apply regardless of whether the Current Plan out-of-pocket maximum amount has been met.  Third, changes agreed to by the Corporation-Union Committee on Health Care Benefits may also apply to Protected Retirees if so agreed by the Corporation Union Committee on Health Care Benefits.  In all other respects, Protected Retirees will continue to receive benefits in accordance with the Current Plan for the duration of this Settlement Agreement.

If it is discovered that a participant initially was misclassified as a General Retiree but who at that time should have been classified as a Protected Retiree, GM will refund the participant's monthly Contributions along with any additional cost sharing borne by the participant during the calendar year in which the misclassification is discovered.  Additionally, in the event that an individual is originally determined to be a Protected Retiree and, through no fault of their own, is subsequently determined to be a General Retiree, such participant will be placed in the Modified Plan on a prospective basis, starting with the first of the month following

such determination, and no retroactive monthly Contributions or Modified Plan cost sharing will be collected from such participant.

###### 6.      General Retirees

General Retirees will be automatically enrolled in the Modified Plan following the enrollment process described in Sections 8 - 10 of this Settlement Agreement. Once enrolled, General Retirees will be subject to all of the terms and conditions of the Modified Plan, including the required Contributions, deductibles, and out-of-pocket maximums set forth in Section 3.A.2 of this Settlement Agreement and the required pension check-off set forth in Section 9.B of this Settlement Agreement. General Retirees who fail to make the monthly Contributions required under the Modified Plan by the Final Due Date, or who fail to make the required pension check-off as required in Section 9.B of this Settlement Agreement will automatically default to the Catastrophic Plan and become Non-Participating Retirees as set forth in Section 9.D of this Settlement Agreement. Any information, notices, and forms to be sent to the prospective General Retirees regarding enrollment in the Modified Plan and the consequences of opting out of the Modified Plan and enrollment in the Catastrophic Plan shall be subject to approval by the IUE-CWA, provided such approval will not be unreasonably withheld and shall be exercised in a timely manner so as not to delay the enrollment process. Such information, notices, and forms, shall also be provided to Class Counsel.

###### 7.      Non-Participating Retirees

Non-Participating Retirees receive coverage only for health care expenses in accordance with the terms and conditions of the Catastrophic Plan. Non-Participating Retirees receive none of their benefits from the Modified Plan. Except as specifically set forth in this Settlement Agreement or Exhibit 2, the terms of the Catastrophic Plan shall be the same as those provided under the Modified Plan. Once enrolled in the Catastrophic Plan, a Non-Participating Retiree must remain in the Catastrophic Plan for a minimum of 12 months, unless the retiree experiences a change in status that permits mid-year changes in cafeteria plans under Section 125 of the Code.

###### 8.      Initial Plan Enrollment

Prior to the Effective Date, GM may send contingent enrollment materials to prospective General Retirees. In all events, GM shall send a material modification notice to all Class Members who are entitled to receive such notice pursuant to applicable regulations, informing them of the plan changes and General Retiree eligibility to participate in the Modified Plan. The material modification notice will explain that Class Members other than Protected Retirees will be terminated from the Current Plan and automatically enrolled in the Modified Plan. Such notice will also explain the terms of coverage under the Catastrophic Plan in the event that a Class Member, other than a Protected Retiree, declines or becomes defaulted to coverage under the Modified Plan. The notices to be sent to General Retirees and Protected Retirees shall be subject to approval by the IUE-CWA, provided such approval will not be unreasonably withheld and shall be exercised in a timely manner so as not to delay the enrollment process. Any Class Member eligible for the Modified Plan who elects not to be enrolled automatically in the Modified Plan during the enrollment period shall either become a participant of the Catastrophic

Plan (i.e., a Non-Participating Retiree) as of the Implementation Date or, may waive or continue to waive health care coverage as permitted under the provisions of the Modified Plan (see Article III, Section 1(a) (2) of the Current Plan).   Notwithstanding any other provisions of this Settlement Agreement, for the six-month period beginning with the Implementation Date, General Retirees who enroll in or default into the Catastrophic Plan will be allowed to enroll in the Modified Plan at any time during such six-month period.

9.      **Payment of Contributions**

A.      <u>Means of Payment</u>.   To receive benefits under the Modified Plan, a General Retiree must make Contributions in accordance with the requirements of this Settlement Agreement.

B.      <u>Pension Check-Off</u>.   Unless prohibited by law, General Retirees must authorize deduction of monthly contributions from their pension payments or provide direction for payment of pension benefits for monthly contributions, collectively referred to throughout this Settlement Agreement as a "pension check-off," as a condition of participation in the Modified Plan. Where pension check-off authorizations are prohibited or for whatever reason cannot be utilized, monthly contributions must be received by the GM Benefits and Services Center by the end of the month in which they are due (the "Final Due Date").

C.      <u>Monthly Statements</u>.   Where pension check-offs are prohibited or for General Retirees whose pension benefits after legally required deductions are less than the required monthly contributions, GM or the Plan Administrator will send monthly statements between 14 and 21 days prior to the Due Date.  The Due Date shall be the first day of the month following the date the monthly statement is sent (the "Due Date").  Contributions must be received by the GM Benefits and Services Center by the Final Due Date.

D.      <u>Effect of Non-Payment</u>.   General Retirees who have monthly contributions that exceed monthly pension benefits available for deduction or directed payment will be allowed to continue coverage under the Modified Plan without break so long as full payment is received by the GM Benefits and Services Center by the Final Due Date.  If the GM Benefits and Services Center has not received payment by the Final Due Date, participation in the Modified Plan shall be terminated and the General Retiree shall be deemed to be a Non-Participating Retiree enrolled by default in the Catastrophic Plan retroactive to the first of the month in which payment was due.  Re-entry of any such person whose coverage in the Modified Plan has been terminated for non-payment of Contributions shall be permitted pursuant to Section 10.B of this Settlement Agreement.

10.     **Enrollment Process**

A.      <u>Options for Non-participants</u>.   General Retirees who, by election or default, do not become participants in the Modified Plan will be Non-Participating Retirees.   Non-Participating Retirees will be allowed to enroll or re-enroll at any time as participants in the Modified Plan only as set forth in Section 10.B of this Settlement Agreement.

B.      <u>Rolling Enrollment</u>.  General Retirees who elect not to participate in the Modified Plan will be enrolled in the Catastrophic Plan for a minimum of 12 months from the date of their

11

election, unless such Non-Participating Retiree experiences a change in status that permits mid-year changes in cafeteria plans under Section 125 of the Code.  If a General Retiree defaults to the Catastrophic Plan for failing to authorize a pension check-off, or withdrawing pension check-off authorization or failing to otherwise make required monthly contributions by the Final Due Date, as outlined in Section 9 of this Settlement Agreement, such person may prospectively re-enroll in the Modified Plan at any time, with such enrollment becoming effective on the first day of the month following the month in which that person calls the GM Benefits and Services Center requesting such change, and provided that person has not had two prior defaults into the Catastrophic Plan in the previous 12 months.  If such previous defaults exist, such person will be enrolled in the Catastrophic Plan for a minimum of 12 months from the date of their default and may prospectively re-enroll in the Modified Plan only after expiration of such 12 month period.

C.  No Pre-Existing Conditions.  With respect to any enrollment decision, there shall be no medical screening, pre-existing condition limitation, or any other health or medical-related limitation on the right of Non-Participating Retirees to enroll in the Modified Plan.

### 11.    Implementation

Implementation and adoption of the Modified Plan, the Catastrophic Plan, and the Administrative Changes, and drug co-payment changes for Protected Retirees, will take place after entry of Judgment approving this Settlement Agreement by the United States District Court in Detroit, but in any event no sooner than January 1, 2007.

### 12.    Fees & Expenses

A.    Fees and Expenses – The IUE-CWA and Class Counsel will apply to the court for reimbursement of reasonable and necessary attorney and professional fees (not to include any success fee, completion bonus, contingent fee or rate premiums) incurred in connection with the court proceedings to obtain the Judgment approving this Settlement Agreement, provided that fees attributable to IUE-CWA in-house legal or professional services shall be reimbursed at the maximum hourly rate of $125 per attorney hour worked and not to exceed an aggregate total of $4,000.00 for in-house services.  GM will not oppose applications that are within the scope of this provision.  Approval of these fee requests will be included in the Judgment.

B.  Fees for Class Representative.  Each party to this Settlement Agreement agrees not to seek any other future fees or expenses from any other party in connection with the lawsuit, except that the Class Representatives or any other party prevailing in any action to enforce the terms of this Settlement Agreement may seek such fees and costs as may be allowed by law.

### 13.    Indemnification

Subject to approval by the Court as part of the Judgment, GM hereby agrees to indemnify and hold harmless the IUE-CWA, and its officers, directors and employees  (each, an "Indemnified Party"), to the extent permitted by law, from and against any and all losses, claims, damages, obligations, assessments, penalties, judgments, awards, and other liabilities (collectively, "Liabilities"), and will fully reimburse any Indemnified Party for any and all reasonable and documented attorney fees and expenses (collectively, "Expenses"), as and when incurred, of investigating, preparing or defending any claim, action, suit, proceeding or

12

investigation, arising out of or in connection with any Liabilities incurred as a result of an Indemnified Party's entering into, or participation in the negotiations for, this Settlement Agreement and the transactions contemplated in connection herewith; provided, however, that such indemnity shall not apply to any portion of any such Liability or Expense that resulted from the gross negligence, illegal or willful misconduct by an Indemnified Party; provided, further, that such indemnity shall not apply to any claim made by or Liabilities to an Active Employee or Future Retiree for breach of the duty of fair representation.

If an Indemnified Party receives notice of any action, proceeding or claim as to which the Indemnified Party proposes to demand indemnification hereunder, it shall provide GM prompt written notice thereof.  Failure by an Indemnified Party to so notify GM shall relieve GM from the obligation to indemnify the Indemnified Party hereunder only to the extent that GM suffers actual prejudice as a result of such failure, but GM shall not be obligated to provide reimbursement for any Expenses incurred for work performed prior to the receipt of written notice to GM.  If an Indemnified Party is entitled to indemnification hereunder, GM will have the right to participate in such proceeding or elect to assume the defense of such action or proceeding at its own expense and through counsel chosen by GM (such counsel being reasonably satisfactory to the Indemnified Party).  The Indemnified Party will cooperate in good faith in such defense.  Upon the assumption by GM of the defense of any such action or proceeding, the Indemnified Party shall have the right to participate in, but not control the defense of, such action and retain its own counsel but the expenses and fees shall be at its expense unless (a) GM has agreed to pay such Expenses, (b) GM shall have failed to employ counsel reasonably satisfactory to an Indemnified Party in a timely manner, or (c) the Indemnified Party shall have been advised by counsel that there are actual or potential conflicting interests between GM and the Indemnified Party that requires separate representation, and GM has agreed that such actual or potential conflict exists (such agreement not to be unreasonably withheld); provided, however, that GM shall not, in connection with any such action or proceeding arising out of the same general allegations, be liable for the reasonable fees and expenses of more than one separate law firm at any time for all Indemnified Parties not having actual or potential conflicts among them, except to the extent that local counsel, in addition to its regular counsel, is required in order to effectively defend against such action or proceeding.  All such fees and expenses shall be invoiced to GM, with such detail and supporting information as GM may reasonably require, in such intervals as GM shall require under its standard billing processes.

If the Indemnified Party receives notice from GM that GM has elected to assume the defense of the action or proceeding, GM will not be liable for any attorney fees or other legal expenses subsequently incurred by the Indemnified Party in connection with the matter.

GM shall not be liable for any settlement of any claim against an Indemnified Party made without GM's written consent, which consent shall not be unreasonably withheld.  GM shall not, without the prior written consent of an Indemnified Party, which consent shall not be unreasonably withheld or delayed, settle or compromise any claim, or permit a default or consent to the entry of any judgment, that would lead to liability or create any financial obligation on the part of the Indemnified Party in respect of which indemnification is sought hereunder.

The termination of this Settlement Agreement shall not affect the indemnity provided hereunder, which shall remain operative and in full force and effect.

### 14.     Class Action Notice Order

The parties shall submit this Settlement Agreement to the Court and jointly work diligently to have this Settlement Agreement approved by the Court by November 1, 2006.  The parties shall seek from the Court an order (the "Notice Order") providing that notice of the hearing on the proposed settlement (the "Fairness Hearing") shall be given to the Class by mailing a copy of the notice contemplated in the Notice Order to the Class, and by publishing a notice approved by the Court in the Dayton Daily News, and a national newspaper such as USA Today.  Until entry of Judgment, copies of this Settlement Agreement shall also be made available for inspection by Class Members at the Court, at the IUE-CWA offices in Washington, D.C., and at the offices of Class Counsel.

### 15.     Dispute Resolution

A.     <u>Coverage.</u>  Any controversy or dispute arising out of or relating to, or involving the application or interpretation of this Settlement Agreement shall be enforceable only by GM, the IUE-CWA, and/or Class Counsel, and is subject to resolution only in accordance with the terms of this Section, <u>provided, however</u>; that (i) disputes relating solely to eligibility or entitlement to benefits provided under the Current Plan, Modified Plan, and Catastrophic Plan, shall be resolved in accordance with the applicable procedures of such Plans, and nothing in this Settlement Agreement precludes Class Members from pursuing appropriate judicial review regarding such disputes; and (ii) disputes arising over the determination of the escalation of indexed amounts and/or the proper basis for calculating the Actual OPEB Trend Rate, which shall be resolved by the Court.

B.     <u>Attempt at Resolution.</u> While the parties agree that each of the disputes referenced in Section 15.A of this Settlement Agreement may be submitted to arbitration, they first shall endeavor to resolve the dispute through the following procedures:

(a)     The aggrieved party shall provide the other party with written notice of such dispute;

(b)     the written notice in Section 15B(a) of this Settlement Agreement shall include a description of the alleged violation and identify the Section(s) of the Settlement Agreement allegedly violated;

(c)     the party receiving the notice shall respond in writing within 21 calendar days of receipt of notice; and

(d)     within 21 calendar days of that response the parties shall meet in an effort to resolve the dispute.

All the time periods in Section 15 of this Settlement Agreement may be extended by agreement of the parties to the particular dispute.

C.      Demand for Arbitration.  Should the parties be unable to resolve the dispute within 30 calendar days from the date of the meeting set forth in Section 15.B(d) of this Settlement Agreement, either party may send written demand to the other party that the issue be resolved by arbitration.  The failure to demand arbitration within 60 calendar days from the date of the meeting set forth in Section 15.B(d) of this Settlement Agreement shall waive any right to such arbitration over the issue, absent mutual written agreement to the contrary by the parties.  If a party fails to make a timely demand for arbitration pursuant to this Section 15.C, such party may not pursue the dispute in court, and the dispute will be resolved on the basis of the position taken by the opposing or answering party.

D.      Arbitration.  In the event that GM, the IUE-CWA, or Class Counsel proceed to arbitration in accordance with this Section, that dispute shall be submitted to an arbitrator (the "Arbitrator") who will not have the authority to modify or amend this Settlement Agreement, but only to apply this Settlement Agreement, as written, to particular factual situations based on a preponderance of the evidence.  The Arbitrator shall not have the authority to award punitive or exemplary damages.  Interest shall be paid on any delayed payments as a result of the arbitration process.  The interest will be calculated daily at a rate equal to the OPEB Discount Rate as set forth in the most recent GM annual report for each day that amounts remain outstanding.  Such arbitration shall take place in Detroit, Michigan unless otherwise agreed upon in writing by the parties.  Any award shall be in writing and issued within 30 days from the close of the hearing, unless the parties otherwise agree.  The award shall be final, conclusive and binding on the IUE-CWA, GM, the Class Members, and Future Retirees.  The award may be reduced to judgment in any appropriate court having jurisdiction in accordance with the provisions of applicable law.

E.      Designation of the Arbitrator.  In the event that a dispute arising under this Section is taken to arbitration, the Arbitrator shall be the arbitrator/umpire used by GM and the IUE-CWA for disputes arising under the then applicable GM-IUE-CWA National Agreement.

F.      Hearing Date.  GM, the IUE-CWA, and Class Counsel shall cooperate in setting a hearing date for the arbitration as soon as possible following selection of the Arbitrator.

G.      Alternate Means of Resolution.  Nothing in this Section shall preclude GM, the IUE-CWA, or Class Counsel from agreeing on any other form of alternative dispute resolution, and such other form so chosen will have, when concluded, the final, conclusive and binding effect specified in Section 15.D of this Settlement Agreement.  GM, the IUE-CWA, and Class Counsel may also agree in writing to resolve a particular dispute arising under this Settlement Agreement but outside the scope of Section 15.A under the procedures of Section 15.B of this Settlement Agreement.

**16.     Conditions and Effective Date of Settlement**

This Settlement Agreement is conditioned upon the occurrence or resolution of Sections 16.A and 16.B of this Settlement Agreement, in the manner described below, the failure of either one of which will render this Settlement Agreement voidable at the discretion of any party:

A.      Class Certification Order.  A final order must be entered by the Court certifying the lawsuit as a class action with the Class defined as, "all persons who, as of April 28, 2006

were 1) GM-IUE-CWA hourly employees, who retired from GM with eligibility to participate in retirement in the General Motors Health Care Program For Hourly Employees, and 2) the spouses, surviving spouses and dependants of GM-IUE-CWA hourly employees, who, as of the April 28, 2006 were eligible for post-retirement or surviving spouse health care coverage under the General Motors Health Care Program For Hourly Employees as a consequence of a GM-IUE-CWA hourly employee's death prior to retirement or retirement from GM" (the "Class Order").  This condition shall be deemed to have failed upon the Court's issuance of a Class Order denying certification of the lawsuit as a class action or upon issuance of a Class Order certifying the lawsuit as a class action but whose membership is less inclusive than as described unless GM, the IUE-CWA and Class Counsel agree in writing to such alternative class description.

B.    <u>Final Judgment</u>.  A Judgment must be entered by the Court in the class action approving this Settlement Agreement in all respects and as to all parties, including GM, the IUE-CWA, Class Representatives and Class Members.  The form of the Judgment shall be acceptable in form and substance to GM, the IUE-CWA and Class Counsel.  This condition shall be deemed to have failed upon issuance of an order disapproving this Settlement Agreement, or upon the issuance of an order approving only a portion of this Settlement Agreement but disapproving other portions, unless GM, the IUE-CWA and Class Counsel agree otherwise in writing.

This Settlement Agreement shall become effective on the date upon which the above conditions have been satisfied (the "Effective Date").

**17.    Duration and Termination of Settlement Agreement**

This Settlement Agreement will remain in effect unless and until terminated in accordance with the terms of this Settlement Agreement.  This Settlement Agreement shall not be subject to amendment, except to the extent and in the manner set forth in this Settlement Agreement.

Termination of this Settlement Agreement may occur as follows:

(a)    If the lawsuit is enjoined or stayed, or withdrawn, dismissed, or otherwise terminated, or if the Judgment is denied in whole or in material part, either GM, the IUE-CWA, or Class Counsel on behalf of the Class Representatives may terminate this Settlement Agreement by 30 days written notice to the other parties.

(b)    If a Class Order satisfactory to the parties, as described in Section 16.A of this Settlement Agreement, is entered by the Court and subsequently overturned in whole or in part on appeal or otherwise, either GM, the IUE-CWA, or Class Counsel on behalf of the Class Representatives may terminate this agreement by 30 days' written notice to the other parties.

(c)    If the Judgment satisfactory to the parties, as described in Section 16.B of this Settlement Agreement, is entered by the Court, but overturned in whole or in part on appeal or otherwise, either GM, the IUE-CWA, or Class Counsel on behalf of the Class Representatives may terminate this Settlement Agreement by 30 days' written notice to the other parties.

(d)     If any court, agency or other tribunal of competent jurisdiction issues a determination that any part of this Settlement Agreement is prohibited or unenforceable, either GM, the IUE-CWA, or Class Counsel on behalf of the Class Representatives may terminate this Settlement Agreement by 30 days' written notice to the other parties.

If this Settlement Agreement does not terminate in accordance with (a), (b), (c) or (d) above, this Settlement Agreement  will continue in effect until at least September 14, 2011.  Thereafter, this Settlement Agreement in its entirety will continue in effect indefinitely, provided, however, that after September 14, 2011, this Settlement Agreement may be terminated as to all parties by GM or the IUE-CWA by providing 90 days' written notice to the other party and to Class Counsel. In the event that either party declares a termination in accordance with this Section 17, all parties will remain protected by the "No Admissions; No Prejudice" provisions in Section 18 as well as the "Releases and Certain Related Matters" in Section 19, and termination of this Settlement Agreement shall not modify or terminate such provisions.

## 18.     No Admissions; No Prejudice

A.     Notwithstanding anything to the contrary, whether set forth in this Settlement Agreement, the Judgment, the Notice Order, any documents filed with the Court in the lawsuit, any documents whether provided in the course of or in any manner whatsoever relating to the 2006 discussions between GM, the IUE-CWA and Class Counsel with respect to health care benefits or relating to this Settlement Agreement or the Term Sheet, whether distributed, otherwise made available to or obtained by any person or organization, including without limitation, Active Employees, Class Members, or the spouses, surviving spouses or dependants of any of the foregoing, or to the IUE-CWA or GM in the course of the negotiations leading to entry into this Settlement Agreement, or otherwise:

(a)     GM denies and continues to deny any wrongdoing or legal liability arising out of any of the allegations, claims and contentions made against GM in the lawsuit and in the course of the negotiation of the Term Sheet or this Settlement Agreement.  None of the Term Sheet, any disputes or discussions between GM and the IUE-CWA with respect to health care benefits or regarding entry into this Settlement Agreement occurring on or after January 1, 2006, this Settlement Agreement nor any document referred to or contemplated herein nor any action taken to carry out this Settlement Agreement nor any retiree health care benefits provided hereunder or any action related in any way to the ongoing administration of such retiree health care benefits (collectively, the "Settlement Actions") is, may be construed as, or may be viewed or used as, an admission by or against GM of any fault, wrongdoing or liability whatsoever, or as an Admission by GM of the validity of any claim or argument made by or on behalf of the IUE-CWA, Active Employees, the Class or Future Retirees, that retiree health benefits are vested. Without limiting in any manner whatsoever the generality of the foregoing, the performance of any Settlement Actions by GM may not be construed, viewed or used as an Admission by or against GM that, following any termination of this Settlement Agreement, it does not have the unilateral right to modify or terminate retiree health care benefits.

(b)     Each of the IUE-CWA, the Class Representatives and the Class Members claim and continue to claim that the allegations, claims and contentions made against GM

17

in the lawsuit have merit. Neither this Settlement Agreement nor any document referred to or contemplated herein nor any Settlement Actions may be construed as, or may be viewed or used as, an Admission by or against any of the IUE-CWA, the Class Representatives or the Class Members of any fault, wrongdoing or liability whatsoever or of the validity of any claim or argument made by or on behalf of GM that GM has a unilateral right to modify or terminate retiree health care benefits or that retiree health care benefits are not vested. Without limiting in any manner whatsoever the generality of the foregoing, the performance of any Settlement Actions by any of the IUE-CWA, the Class Representatives or the Class Members, including without limitation, the acceptance of any retiree health care benefits under any of the GM health care plans set forth in this Settlement Agreement, may not be construed, viewed or used as an Admission by or against any of the IUE-CWA, the Class Representatives or the Class Members that, in the event of any termination of this Settlement Agreement, GM has the unilateral right to modify or terminate retiree health care benefits.

(c)     There has been no determination by any court as to the factual allegations made against GM in the lawsuit. Entering into this Settlement Agreement and performance of any of the Settlement Actions shall not be construed as, or deemed to be evidence of, an Admission by any of the parties hereto, and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal or forum for any purpose whatsoever other than to enforce the provisions of this Settlement Agreement or to obtain or seek approval of this Settlement Agreement in accordance with Rule 23 of the Federal Rules of Civil Procedure and the Class Action Fairness Act of 2005.

B.     This Settlement Agreement and anything occurring in connection with reaching this Settlement Agreement are without prejudice to GM, the IUE-CWA and the Class Members. The parties may use this Settlement Agreement to assist in securing the Judgment approving the settlement and to implement the Administrative Changes in accordance with Exhibit 1 to this Settlement Agreement. It is intended that neither GM nor the IUE-CWA, Future Retirees or the Class Members may use this Settlement Agreement, or anything occurring in connection with reaching this Agreement, as evidence against GM, the IUE-CWA or the Class Members in any circumstance except where the parties are operating under or enforcing this Settlement Agreement or the Judgment approving this Settlement Agreement.

C.     GM, the IUE-CWA, and the Class Members expressly agree and acknowledge that each party is entering into this Settlement Agreement and compromising material claims in light of the Case Law as it exists as of the Effective Date. For purposes of this Settlement Agreement, "Case Law" shall mean, judicial decisional law, whether existing in the federal system (including, but not limited to, decisions of the United States Supreme Court or any United States Circuit Court of Appeals) or in any state or locality; but does not include statutes, regulations, codes, rules or subsequent legislative, regulatory or administrative developments.

Each of the parties hereto further expressly agree and acknowledge that in the event that GM terminates this Settlement Agreement in accordance with Section 16 or 17 hereof, and there is litigation between GM, the IUE-CWA and/or, the Class Members over the right of GM to unilaterally modify and/or terminate retiree health benefits or whether such benefits are vested,

the Case Law as of the Effective Date shall be treated as the applicable body of judicial decisional law for such litigation, subject to any and all changes in the applicable law from legislative, regulatory, or administrative developments after the Effective Date and provided that neither the Class Members nor the IUE-CWA would retain the right to seek damages, reimbursement or recovery in connection with the health care changes incorporated in this Settlement Agreement and the applicable plans for the Effective Period. Moreover, (i) GM, the IUE-CWA, and the Class Members may make any and all arguments in any such litigation as are available to them regarding such Case Law as of the Effective Date, and (ii) for purposes of any applicable statute of limitations, any changes in retiree health care benefits provided for in this Settlement Agreement shall be deemed to have occurred on the date this Settlement Agreement terminates.

For the avoidance of doubt, it is the express intention and agreement of GM, the IUE-CWA and Class Members to apply the Case Law as of the Effective Date to any litigation between GM, the IUE-CWA, and/or Class Members over the right of GM to unilaterally modify and/or terminate retiree health benefits or whether such benefits are vested should this Settlement Agreement be terminated by GM in accordance with Section 17, subject to any and all changes in the applicable law from subsequent legislative, regulatory, or administrative developments and the right of GM, the IUE-CWA and the Class Members to make any and all arguments in any such litigation as are available to it regarding such Case Law as of the Effective Date. No judicial decisions issued after the Effective Date shall be relevant to or have any bearing on consideration or resolution by any court, administrative agency or other tribunal or forum of the issue of GM's right to unilaterally modify and/or terminate retiree health care benefits or whether such benefits are vested in any litigation between GM, the IUE-CWA, and/or Class Members should this Settlement Agreement be terminated by GM in accordance with Section 17, except insofar as they reflect changes in applicable law resulting from legislative, regulatory or administrative developments after the Effective Date. GM, the IUE-CWA and/or Class Members shall not be precluded from raising any legal theory or argument which such parties could have made under the Case Law as of the Effective Date merely because it is reflected in a judicial decision after the Effective Date.

This provision is a material part of this Settlement Agreement. The Judgment shall expressly recite and confirm the provisions of this Section. In the event this Settlement Agreement is terminated, nothing in this Section shall prevent GM, the IUE-CWA, and the Class Members from using, relying or referring, in support of their respective positions, to any documentary evidence which was in existence on January 1, 2006, and which such parties, on the Effective Date, could have used, relied upon or referred to in support of their respective positions, except that plan documents and similar material prepared and distributed up to the Ratification Date without regard to the discussions leading up to the negotiation of the MOU and this Settlement Agreement may be so relied upon and referred to by GM, the IUE-CWA or Class Members, to the extent such documents and similar materials are consistent with the previous versions that were in effect on January 1, 2006.

GM further agrees, in its capacity as settlor, sponsor and administrator of the General Motors Health Care Program for Hourly Employees, that the Plan shall, to the extent permitted by ERISA, be bound by this Section to the same extent as GM and is subject to the same conditions and limitations as GM under this Section.

**19.      Releases and Certain Related Matters**

A.      For the purposes of this Section, GM and the IUE-CWA refer to General Motors Corporation and the Union, respectively, as organizations, as well as any and all of their respective directors, officers, employees and agents.

B.      In consideration of GM's entry into this Settlement Agreement, and the other obligations of GM contained herein, the Class Representatives, the Class Counsel and the IUE-CWA hereby consent to the entry of the Judgment, which will be binding upon all Class Members pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.  All of the release provisions set forth in this Settlement Agreement shall be provided in or encompassed by the Judgment.

C.      As of the Effective Date, each of the IUE-CWA, the Class Representatives, Class Counsel, Class Members, Future Retirees and anyone claiming on behalf of, through or under them by way of subrogation or otherwise (each, a "IUE-CWA Releasee") shall be forever released and discharged with respect to any and all rights, claims or causes of action that such IUE-CWA Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of or based upon or otherwise related to any of the claims raised, or that could have been raised, in connection with the lawsuit concerning the provision of health care benefits during the time period that this Settlement Agreement remains in full force and effect (the "Effective Period"); as well as any claims that this Settlement Agreement, any document referred to or contemplated herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations.

D.      As of the Effective Date, GM shall be forever released and discharged with respect to any and all rights, claims or causes of action that any IUE-CWA Releasee had, has or hereafter may have, whether known or unknown, suspected or unsuspected, concealed or hidden, arising out of, based upon or otherwise related to any of the claims raised, or that could have been raised, in connection with the lawsuit concerning the provision of retiree health care benefits during the Effective Period, as well as any claims that this Settlement Agreement, any document referred to or contemplated herein or any action taken to carry out this Settlement Agreement is not in compliance with applicable laws and regulations; provided, however, that this Settlement Agreement does not waive or release any claims which any IUE-CWA Releasee had, has or hereafter may have with respect to any obligation of GM not arising in connection with this litigation.

E.      Neither the entry into this Settlement Agreement nor the consent to the Judgment is, may be construed as, or may be used as, an admission by or against GM or any IUE-CWA Releasee of any fault, wrongdoing or liability whatsoever.

**20.      Other Provisions**

A.      References in this Settlement Agreement to "Sections," "Paragraphs" and "Exhibits" refer to the Sections, Paragraphs, and Exhibits of this Settlement Agreement unless otherwise specified.

B.      No waiver of any provision of this Agreement shall be effective unless evidenced by a written instrument signed by the waiving party.  In addition, no waiver of any particular breach of this Agreement shall be deemed to apply to any other breach, whether before or after such waiver.

C.      The Court will retain exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of this Settlement Agreement.  Each of the parties hereto expressly and irrevocably submits to the jurisdiction of the Court and expressly waives any argument it may have with respect to venue or forum non conveniens.

D.      This Settlement Agreement constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than representations, warranties and covenants contained and memorialized in this Settlement Agreement.  This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement.

E.      The captions used in this Settlement Agreement are for convenience of reference only and do not constitute a part of this Settlement Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Settlement Agreement, and all provisions of this Settlement Agreement will be enforced and construed as if no captions had been used in this Settlement Agreement.

F.      The Class Representatives expressly authorize Class Counsel to take all appropriate action required or permitted to be taken by the Class Representatives pursuant to this Settlement Agreement to effectuate its terms and also expressly authorize Class Counsel to enter into any non-material modifications or amendments to this Settlement Agreement on behalf of them that Class Counsel deems appropriate from the date this Settlement Agreement is signed until the Effective Date; provided, however, that the effectiveness of any such amendment which adversely impacts the level of benefits to any Class Member as well as any material amendment shall be subject to the approval of the Court.

G.      This Settlement Agreement may be executed in two or more counterparts.  All executed counterparts and each of them shall be deemed to be one and the same instrument, provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

H.      No party to this Settlement Agreement may assign any of its rights hereunder without the prior written consent of the other parties, and any purported assignment in violation of this sentence shall be void. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

I.      Each of GM, the IUE-CWA, Class Representatives, Class Members and the Class Counsel shall do any and all acts and things, and shall execute and deliver any and all documents, as may be necessary or appropriate to effect the purposes of this Settlement Agreement.

21

J.      This Settlement Agreement shall be construed in accordance with applicable federal laws of the United States of America.

K.      Any provision of this Settlement Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and any such provision, to the extent invalid or unenforceable, shall be replaced by a valid and enforceable provision preserving the same economic effect for the parties under this Settlement Agreement.

L.      In the event that any payment referenced in this Settlement Agreement is due to be made on a weekend or a holiday, the payment shall be made on the first business day following such weekend or holiday.

M.      Any notice, request, information or other document to be given under this Settlement Agreement to any of the parties by any other party shall be in writing and delivered personally, or sent by Federal Express or other carrier which guarantees next-day delivery, transmitted by facsimile, transmitted by email if in an Adobe Acrobat PDF file, or sent by registered or certified mail, postage prepaid, at the following addresses.  All such notices and communication shall be effective when delivered by hand, or, in the case of registered or certified mail, Federal Express or other carrier, upon receipt, or, in the case of facsimile or email transmission, when transmitted (provided, however, that any notice or communication transmitted by facsimile or email shall be immediately confirmed by a telephone call to the recipient.):

If to the Class Representatives or Class Counsel, addressed to:

> William T. Payne
> 1007 Mt. Royal Boulevard
> Pittsburgh, PA  15223
> Tel: (412) 492-8797
> wpayne@stargate.net

In each case with copies to:

> John Stember
> Edward Feinstein
> STEMBER FEINSTEIN
> 1705 Allegheny Building
> 429 Forbes Avenue
> Pittsburgh, PA 15219
> Tel: (412) 338-1445
> jstember@stemberfeinstein.com
> efeinstein@stemberfeinstein.com

If to GM, addressed to:

22

Diana Tremblay
GMNA Vice President of Labor Relations
General Motors Corporation
2000 Centerpoint Parkway
Pontiac, MI   48341
Tel: (248) 753-2243

in each case with copies to:

Francis S. Jaworski
Office of the General Counsel
General Motors Corporation
Mail Code 482-C25-B21
300 Renaissance Center
P.O. Box 300
Detroit, MI 48265-3000
Tel: (313) 665-4914
francis.s.jaworski@gm.com

If to IUE-CWA, addressed to:

Peter Mitchell and
Alexia McCaskill
IUE-CWA
501 Third Street, N.W., Suite 800
Washington, D.C. 20001
Tel: (202) 434-1408
pmitchell@iue-cwa.org
Amccaskill@iue-cwa.org

In each case with copies to:

Stuart M. Israel
Martens, Ice, Klass, Legghio & Israel, P.C.
306 South Washington, Suite 600
Royal Oak, MI 48067
Tel: (248) 398-5900
Israel@martensice.com

N.      IN WITNESS THEREOF, the parties hereto have caused this Settlement Agreement to be executed by themselves or their duly authorized attorneys.


By:     /s/ Francis S. Jaworski (by consent)          Dated:  July 27, 2006

        Francis S. Jaworski
        Office of the General Counsel
        General Motors Corporation
        Mail Code 482-C25-B21
        300 Renaissance Center
        P.O. Box 300
        Detroit, MI 48265-3000
        Tel: (313) 665-4914
        francis.s.jaworski@gm.com

        COUNSEL FOR DEFENDANT GENERAL
        MOTORS CORPORATION


By:     /s/ Peter Mitchell (by consent)          Dated:  July 27, 2006

        Peter Mitchell
        IUE-CWA
        501 Third Street, N.W., Suite 800
        Washington, D.C. 20001
        Tel: (202) 434-1408

By:     /s/ Stuart M. Israel (by consent)          Dated:  July 27, 2006

        Stuart M. Israel
        Martens, Ice, Klass, Legghio & Israel, P.C.
        306 South Washington, Suite 600
        Royal Oak, MI 48067
        Tel: (248) 398-5900

        COUNSEL FOR PLAINTIFFS
        INTERNATIONAL UNION, IUE-CWA


By:     /s/ William T. Payne (by consent)          Dated:  July 27, 2006

        William T. Payne
        1007 Mt. Royal Boulevard
        Pittsburgh, PA  15222
        Tel: (412) 492-8797
        wpayne@stargate.net

John Stember
Edward Feinstein
STEMBER FEINSTEIN
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Tel: (412) 338-1445
jstember@stemberfeinstein.com
efeinstein@stemberfeinstein.com

COUNSEL FOR PLAINTIFFS LARRY
COMBS, EVA COX, MARY DAVIS, LEE
HILL AND EARL R. WILLIAMS

**LIST OF EXHIBITS**

**Exhibit 1:**     **Administrative Changes to the Current Plan**

**Exhibit 2:**     **Catastrophic Plan**

**EXHIBIT 1: ADMINISTRATIVE CHANGES TO THE CURRENT PLAN**

**Health Care Program Modifications**
**Effective As Noted in Each Item Listed Below**

**Coordination With Medicare**

- **Coverage to Medicare B Benefit (regardless of Med B enrollment) and Medicare Part B Maximum Payment Provisions:**

  - For Medicare eligible enrollees (regardless of whether or not they are enrolled in Medicare Part B), Program benefits will be limited to an amount equal to the secondary balance payment that would have been made on the basis that, on the date of services, the enrollee was enrolled in Medicare Part B and received services from a provider that participates in Medicare. In the event an enrollee receives services from a provider that does not accept assignment, the enrollee will be responsible for all fees charged above the Medicare allowed amount, unless the enrollee is in a situation in which the enrollee does not have the ability or control to select a provider that accepts Medicare assignment to perform the service. No enrollee payment over the Medicare allowed amount will count towards enrollee cost sharing maximums.

  - It is recognized that the above provisions will indirectly require Medicare eligible enrollees who delayed enrollment in Medicare B, to enroll upon the implementation date of this agreement. GM and the IUE-CWA agree to send educational pieces 90-120 days prior to implementation, to those enrollees identified as eligible for Medicare, but not yet enrolled. Such delayed enrollment into Medicare Part B will result in penalties being applied by Medicare to the Part B monthly premiums. GM has agreed to work with Medicare to identify a way to eliminate penalties incurred. This may involve GM making a lump sum payment to Medicare; however, these discussions are not complete at this time. In the event GM and Medicare cannot reach agreement on eliminating the penalty, GM will establish a single nationwide Traditional Care Network (TCN) plan in which Medicare eligible enrollees who have elected to delay enrollment in Medicare Part B will be enrolled and this plan will not be subject to the provisions outlined in the first bullet above. Any enrollee in this group who later decides to enroll in Medicare Part B will be placed in a regular TCN plan and will be fully responsible for any and all penalties incurred at that time.

- **Coordination of Benefits for Medications covered under Medicare Part B:**

  - GM and the IUE-CWA agree to encourage Medicare Part B enrollees to assign Medicare benefits to those pharmacies from which the enrollee receives medications that are covered under Medicare Part B. A program will be developed and implemented to educate enrollees about Medicare paying for certain medications and to encourage enrollees to use those pharmacies that have

2

the capabilities to electronically bill Medicare and to assign Medicare benefits to such pharmacies in order for the Program to take advantage of Medicare paying primary on the claim.  Further, GM and the IUE-CWA agree to monitor the improvement of electronic Medicare billing capabilities across the pharmacy network.  Upon mutual agreement between GM and the IUE-CWA,  GM and the IUE-CWA may at a later date implement a mandatory program.  At that point, enrollees who utilize pharmacies which do not have electronic claim submission capabilities with Medicare will be required to pay for the secondary balance of the claim at the point of sale and seek reimbursement via submission of a paper claim from the prescription drug carrier.

- The provisions outlined above will not apply to Active Employees who are enrollees eligible for Medicare as their primary coverage.

- This entire Program Coordination related to Medicare Eligible Enrollees will be implemented as soon as practicable after approval of the agreement by the Federal District Court.

**Hospital/Surgical/Medical Modifications – TCN and PPO, Unless Otherwise Specified**

1.  **"Cosmetic" Provisions** -- Eliminate coverage for inpatient and outpatient hospital services (e.g., room & board, lab, x-rays, etc.) provided in conjunction with non-covered "plastic, cosmetic and reconstructive" surgeries.

    - This entire Program Modification related to Modifying "Cosmetic" Provisions will be implemented as soon as practicable after approval of the agreement by the Federal District Court .

2.  **Referral Process for the "Preferred Provider Organization" Option**

    - Require prospective authorization of out-of-network referrals.

    - In the event a referral is not approved prior to a service being provided, the enrollee is responsible for the out-of-network co-insurance.  Any amount charged over R&C does not count toward enrollee cost sharing maximums.

    - GM and the IUE-CWA agree not to promote further reductions in PPO networks as outlined in the Miscellaneous Letter (Preferred Provider Organization), but to support ongoing network improvements by the carriers as quality and performance evaluation tools continue to develop and are utilized to drive members to high performing providers, as mutually agreed upon between GM and the IUE-CWA.

    - This entire Program Modification related to Improving the Referral Process for the "Preferred Provider Organization" Option will be implemented as soon as practicable after the approval of the agreement by the Federal District Court.

3.      **Hold Harmless** – Except as otherwise provided in Section 4 of the Miscellaneous Letter entitled Understandings With Respect To Health Care-General, when an enrollee receives services from a physician who is not participating in Blue Cross Blue Shield (BCBS) or United Health Care (UHC) networks or from a facility not participating in a UHC network, the Program will be responsible to pay only up to the reasonable and customary (R&C) level as determined by the carrier.  The enrollee will be responsible for all fees charged above R&C, unless the enrollee is in a situation in which the enrollee does not have the ability or control to select a par provider to perform the service.  Such amounts over R&C are considered "Other Amounts Not Covered" by the Health Care Program and therefore will be the responsibility of the enrollee and will not be applied towards enrollee cost-sharing.

- This entire Program Modification Related to Modifying Hold Harmless will be implemented as soon as practicable after the approval of the agreement by the Federal District Court.

4

## EXHIBIT 2: CATASTROPHIC PLAN

This option will be a single catastrophic Traditional Care Network (TCN) plan offering which will consist, in general, of the following:

Eligibility:  All General Retirees, are eligible to enroll in this Catastrophic Plan.

Initial and Ongoing Enrollment:  General Retirees who fail to pay the monthly Contributions required under the Modified Plan by the Final Due Date will automatically default to the Catastrophic Plan and become Non-Participating Retirees as set forth in Section 9.D of this Settlement Agreement.  As well, General Retirees may voluntarily elect to enroll in this plan.  General Retirees who are enrolled in this catastrophic TCN Plan (i.e., Non-Participating Retirees) will be subject to the Rolling Enrollment rules set forth in Section 10.B of this Settlement Agreement.

Plan Design:

> Monthly Contribution:  $0
>
> Deductible:  $1,250 (single) and $2,500 (family)
>
> Co-insurance:  after deductible is met, 10% in-network and 30% out of network
>
> Out-of-Pocket Maximums:        $2,500 (single) and $5,000 (family) in-network; $5,000 (single) and $10,000 (family) out-of-network
>
> ER Co-Payment:  $100 per visit, waived if admitted
>
> Rx Co-payment Retail:  $15 Generic, $35 Brand;  $50 (Erectile Dysfunction medications)
>
> Rx Co-Payment Mail Order:  $30 Generic, $70 Brand;  $100 (Erectile Dysfunction medications)

All dollar-denominated plan design items such as drug co-payments, deductibles and out-of-pocket maximums will increase annually as of the beginning of each calendar year at the lesser of (a) Actual OPEB Trend Rate, but not less than zero, or (b) 3% ("Escalation") and will be rounded to the nearest whole dollar amount in accordance with the Engineering Method of Rounding used in the COLA calculation.