**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

IUE-CWA, the Industrial Division of the
Communications Workers of America, AFL-CIO,
CLC; AND LARRY COMBS, EVA COX, MARY
DAVIS, LEE HILL, and EARL R. WILLIAMS,
on behalf of themselves and all other persons
similarly situated,

                  Plaintiffs,

                        *v.*

GENERAL MOTORS CORPORATION,

                  Defendant.

_____/

Case No.: 06-12151
(CLASS ACTION)

Honorable Denise Page Hood

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.     INTRODUCTION/BACKGROUND**

     This matter is before the Court on the parties' request for final approval of the parties' class

action settlement resolving plaintiffs' complaint filed on May 10, 2006. A Fairness Hearing was

held on October 5, 2006. Although Objections were filed by several individuals, no objectors

appeared at the hearing. Following the Fairness Hearing the parties submitted a Joint Proposed

Findings of Fact and Conclusions of Law. The Court has reviewed the arguments presented and

briefs filed by the parties, the Objections submitted by the objectors and the Joint Proposed Findings

of Fact and Conclusions of Law[1] and sets forth its findings and conclusions below.

---

[1] Except for some minor edits, the Court adopts the parties' Joint Proposed Findings of Fact and
Conclusions of Law as submitted.

## II.     FINDINGS OF FACT

### A.     The Parties

Defendant General Motors Corporation ("GM") and Plaintiff IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC ("IUE-CWA") are parties to a series of collective bargaining agreements ("CBAs"), under which GM provides health care benefits to qualifying retirees and their spouses, surviving spouses, and dependents.  (Doc. # 1, Complaint ("Cplt") ¶ 11; *e.g.*, Doc. 60, Exhibit A, Declaration of Shelly L. Hoffmann ("Hoffmann Decl."), Exs. 1-3)  Plaintiffs Larry Combs, Eva Cox, Mary Davis, Lee Hill, and Earl R. Williams ("Class Representatives") are former hourly employees of GM who have retired.  (Cplt. ¶¶ 6-10; Doc. 8, Ex. 10, Declaration of Plaintiff Combs; Ex. 11, Declaration of Plaintiff Cox; Ex. 12, Declaration of Plaintiff Davis; Ex. 13, Declaration of Plaintiff Hill; Ex. 14, Declaration of Plaintiff Williams)  Three of the five Class Representatives served as officials in the retiree clubs for their local unions.  (Cplt. ¶¶ 6-10)  All Class Representatives signed retainers authorizing William T. Payne and the firm Stember Feinstein (collectively, "Class Counsel") to represent them before they became parties to this litigation.  (Doc. 8, Ex. 1, Declaration of William Payne ("Payne Decl.") ¶ 20)

On August 1, 2006, the Court approved these plaintiffs as representatives of a class of approximately 32,000 members, defined as:

> All persons who, as of April 28, 2006, were (a) GM/IUE-CWA hourly employees who had retired from GM with eligibility to participate in retirement in the GM Health Care Program for Hourly Employees, or (b) the spouses, surviving spouses and dependents of GM/IUE-CWA hourly employees, who, as of April 28, 2006, were eligible for post-retirement or surviving spouse health care coverage under the GM Health Care Program for Hourly Employees as a consequence of a GM/IUE-CWA hourly employee's retirement from GM or death prior to retirement.

(Doc. 16, Order ¶ 8)

2

### B.      Plaintiffs' Claims and GM's Defenses

In their complaint, plaintiffs allege that GM announced that it intended to make unilateral reductions in health care benefits provided to its retirees, their spouses, surviving spouses, and dependents.  (Cplt. ¶ 24)  Plaintiffs further allege that under the terms of the CBAs, GM is "obligated to provide certain retiree health care benefits" to the Class and "may not unilaterally terminate or modify those benefits."  (*Id.* ¶¶ 21, 23)  According to plaintiffs, GM's decision to modify those benefits is an "anticipatory repudiation" of its "contractual obligations" under the CBA and "its obligations as plan sponsor and administrator" of an employee welfare plan.  (*Id.* ¶¶ 27, 30)  In Count I, brought under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, plaintiffs seek an injunction and a declaration that GM may not unilaterally terminate or modify retiree health care benefits.  (*Id.* ¶¶ 3, 26-28)  The Class Representatives also seek the same relief, in Count II, under § 502(a)(l)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(l)(B) and (a)(3).  (*Id.* ¶¶ 4, 29-31)

GM filed an Answer and Affirmative Defenses, denying that the retiree health care benefits it provides are vested.  (Doc. 4, Answer ¶ 24)  GM maintains that modifications to retiree health care benefits are an essential component of its turnaround plan and "the failure or inability to implement such changes and modifications will have serious financial and business consequences for GM."  (*Id.* ¶ 25)  GM asserts numerous affirmative defenses, including that the plaintiffs' claims are barred by the terms of the CBAs, as well as by acquiescence, waiver, ratification and/or estoppel.  (*Id.*, Affirmative Defenses ¶¶ 1-9)

### C.      GM's Business And Its Impact On Michigan, Ohio And Other U.S. Communities

The record reflects the size and magnitude of GM's operations and its impact on the communities in which it operates.  Either directly or indirectly, nearly one million Americans earn

their living by building, marketing and selling GM cars and trucks. (Doc. 60, Exhibit B, Declaration of Mark E. Newman ("Newman Decl.") ¶ 25) In 2005, GM employed 166,323 U.S.-based employees, with a combined hourly and salary payroll of $14.5 billion per year. (*Id.* ¶ 26) As a leading U.S. employer — currently and historically — GM is the single largest private purchaser of health care in the United States, providing health care benefits for approximately 1.1 million people, over half of whom are retirees and their dependents. (Doc. 60, Exhibit C, Declaration of Michael Raleigh ("Raleigh Decl.") ¶ 4) Given its size and the magnitude of its operations, GM is important to the economies of the states of Michigan and Ohio (where most class members reside) and communities across the United States.

GM is Michigan's largest employer, with nearly 60 locations statewide, and directly employs more than 71,000 Michigan residents. (Raleigh Decl. ¶ 23; Ex. B, Newman Decl. ¶ 25) More than twice that many individuals (165,000) are GM retirees who reside in Michigan. (Raleigh Decl. ¶ 23) GM also has a substantial presence in Ohio, with more than 25 sites, 18,000 employees with an annual payroll of nearly $1.4 billion, and more than 62,000 retirees. (Raleigh Decl. ¶ 23) More broadly, GM operates vehicle assembly plants in 16 states and maintains other operations, such as Service Parts warehousing facilities, throughout the nation. (Newman Decl. ¶ 25) In the past five years alone, GM has made capital investments of more than $22 billion in the U.S., and purchased hundreds of billions of dollars in parts and supplies. (*Id.* ¶ 26) GM spends more than $5 billion annually just in research and development, and in 2005 spent $6.7 billion. (*Id.*)

### D.    GM's Financial Struggle

GM's financial struggle and the effect of retiree health care liability on GM's ability to compete are well known and have been widely reported. (*E.g.*, Doc. 11, Declaration of John F. Hagan, Jr., Exs. 1-6, 9-12; Newman Decl. ¶ 2) The record evidence reflects the extent of GM's difficulties. For example, in 2005, GM reported a consolidated net loss of $10.6 billion, including

$8.2 billion reported by GM's North America business unit (GMNA).  (Newman Decl. ¶¶ 2-3)
Despite recent improvements in its cost structure, GMNA lost money in the first half of 2006
(excluding special items).  (*Id.*)

GM's automotive operating cash flow (*i.e.*, GM's managerial measurement of cash flow
generated by the automotive business, which includes capital expenditures) has also substantially
declined.  In 2003, GM's automotive operations generated $10.2 billion of operating cash flow.  (*Id.*
¶ 5)  In 2004, however, the company's automotive operations generated less than half that amount,
and by 2005, GM experienced negative automotive operating cash flow of $6 billion, without
including special items.  (*Id.*)  While cash flow improved in the first half of 2006, it was still
negative.  (*Id.*)

These financial difficulties reflect a longer business trend.  In general, GM's position in the
U.S. automotive market has significantly declined — from a 40% share in 1985 to less than 25% this
year — as many new brands have entered the North American market.  (*Id.* ¶ 4)  These import
brands have a pricing and competitive advantage in large part because they do not bear the retiree
pension and health care expenses of long-established domestic U.S. companies, such as GM.  (*Id.*)

### E.   The Role of Health Care And, Specifically, Retiree Health Care Cost In GM's Financial Struggle

GM submitted evidence of its health care costs, which have significantly increased and are
expected to continue to do so for the foreseeable future, contributing to its financial struggle.
(Raleigh Decl. ¶¶ 3-4)  In 2005, GM spent $5.4 billion on health care benefits alone, including $1.5
billion just for prescription drugs, the cost of which has increased 100% since 1999 and 333% since
1993.  (*Id.* ¶ 4)  Of the $5.4 billion total, almost 70% was devoted to retiree health care costs.  This
is an increase from 2004, in which GM spent $5.2 billion for health care, with two-thirds of that total
going to retiree health benefits.  (*Id.*)  The evidence shows that, even with increases in health care

cost-sharing from GM hourly retirees, GM's hourly retiree health care spending will continue to grow as a share of GM's overall health care spending going forward.  (Raleigh Decl. ¶ 5)

The evidence also shows that there are now nearly four retirees drawing a pension and other benefits for every active worker, a ratio that is six to one for the IUE-CWA retirees.  (*Id.*)  Thus, GM has a substantial legacy of retired workers who outnumber its active workforce, to the point where it is increasingly difficult for the operations side of GM's business to generate sufficient cash to fund retiree benefits, a significant component of which is escalating health care expenses.  (*Id.* ¶¶ 5, 11; Doc. 60, Ex. D, Declaration of Janemarie Mulvey, Ph.D. ("Mulvey Decl.") ¶ 20)  GM currently projects that nearly 75% of its anticipated $5.7 billion health care budget for 2009 will be spent providing health care to retirees (not including any additional health care liabilities for GM as a possible consequence of certain benefit guarantees related to GM's spin off of Delphi Corporation, which filed for bankruptcy in October 2005).  (Raleigh Decl. ¶ 5; *see also* Newman Decl. ¶ 7)

GM also submitted evidence of its gross accumulated post-employment benefit obligations or APBO, which reflects the net present value, based on the current plan coverages, of GM's retiree health care and life insurance obligations to all of its employees and retirees.  (Raleigh Decl. ¶ 6) GM's U.S. APBO as of year-end 2005 was $81.2 billion, which represents increases of over $7 billion from 2003 and nearly $33 billion from 2000.  (*Id.*)  At year end 2005, GM projected that, without the currently contemplated concessions from hourly GM retirees, its APBO would exceed $90 billion by 2009, apart from the possible consequences of Delphi's bankruptcy.  (*Id.* ¶ 7)

The evidence shows that GM's U.S. APBO is, according to publicly-available data, larger than the total APBO of any other U.S. company.  (*Id.*)  In response to its extraordinarily high APBO and health care cost burden, GM set aside, as of the end of last year, $19.1 billion in a voluntary employees' beneficiary association (VEBA) and 401(h) trusts to fund benefits primarily for hourly retirees.  Notwithstanding those substantial assets, GM's U.S. Other Post Employment Benefit

("OPEB") plans were underfunded by $62.1 billion in 2005, an $8.3 billion increase from 2004.  (*Id.* ¶ 8)

If GM does not address escalating retiree health care costs and improve its cash flow, the company contends that it will be unable to make additional voluntary VEBA contributions to offset future APBO increases, and day-to-day operational needs will require withdrawals from the VEBA, further increasing the unfunded portion of GM's APBO.  (*Id.* ¶ 10)  The evidence reflects  that GM has already withdrawn significant funds from its VEBA trust to reimburse GM for payments for hourly retiree health-care insurance.  GM's ever-rising health care costs have also adversely affected investor confidence in GM.  (Newman Decl. ¶ 8)  Although GM regained some market share during 2006, its stock price has lost more than two-thirds of its value since April 2000, declining from over $90 per share at that time to less than approximately $30 on August 21, 2006.  (*Id.*)

Likewise, in 2005, GM's credit rating was downgraded by major credit rating agencies to non-investment grade or "junk" bond status. (*Id.* ¶¶ 7, 9 (quoting 5/5/05 Standard & Poor's Press Release, *General Motors Corp., GMAC Ratings Lowered to 'BB' On Concerns About Business Prospects*, *id.* Ex. 1)) Consequently, GM's access to capital markets remains limited due to low credit ratings and additional credit rating downgrades in 2006, which restricts GM's ability to invest in the future of its core business — the production and sale of cars and trucks.  (*Id.* ¶ 11)

The evidence shows that GM's health care liability has had a double negative impact on the company, first by diverting enormous amounts of needed resources away from business operations, and second, by eroding investor confidence and thereby increasing the resources needed to fuel those operations.  (*Id.* ¶ 13)

**F.     GM's Turnaround Plan And The Contributions Of Other GM Constituencies**

GM has undertaken several cost-reduction initiatives as part of its turnaround plan to reduce structural costs and the risks to its business.  (Newman Decl. ¶ 14)  In this regard, GMNA has set

a structural cost reduction target of $9 billion on an average annual running rate basis by the end of 2006. (*Id.*) In addition, GM has pursued reductions to both component purchasing costs and excess manufacturing capacity, including the closing or idling of several plants. (*Id.* ¶¶ 14, 15) For example, in November 2005, GM announced a plan to reduce its workforce by approximately 30,000 employees by the end of 2008. (*Id.* ¶ 15) GM also has reduced its U.S. salaried workforce by more than 3,500 employees in the last year (and more than 7,000 over the past three years), and further reductions are anticipated in 2006. (Raleigh Decl. ¶ 13)

Earlier this year, GM announced plans to substantially alter pension benefits for current U.S. salaried employees. (Newman Decl. ¶ 16) It also modified health care benefits it provides for salaried workers and retirees in 2005 and, in February 2006, announced that GM's contributions to salaried retiree health care would be capped at 2006 levels. (*Id.* ¶ 18; Raleigh Decl. ¶¶ 9 n.3, 14) In addition, GM recently reduced the cash dividend paid to shareholders by 50%, cut the salaries of its chairman and chief executive officer and other top executives, and reduced by half the compensation for outside members of its board of directors. (Newman Decl.¶ 19)

### G.  GM's Announced Modifications To Hourly Retiree Health Care Benefits And The GM/UAW Class Action Settlement Agreement

Last year, GM announced its intention to modify health care benefits for retired hourly employees. In response, the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") entered into negotiations with GM regarding these modifications, and the UAW and individual GM/UAW retirees filed a class action challenging GM's asserted right to unilaterally modify those benefits. The parties eventually agreed to settle, and their proposed class action settlement agreement was approved by the Honorable Robert H. Cleland. *See UAW v. GM*, No. 05-CV-73991-DT, 2006 U.S. Dist. LEXIS 14890 (E.D. Mich. Mar. 31, 2006) (Doc. 10, Ex. B)

Full implementation of the GM/UAW Settlement Agreement (and the GM/UAW Memorandum of Understanding ratified by active GM/UAW employees) will reduce GM's APBO by a projected $17 billion. However, GM would remain burdened by more than $40 billion (at prevailing interest rates) in unfunded APBO liabilities — *i.e.*, more than double GM's market capitalization as of August 21, 2006. (Raleigh Decl. ¶ 9; Newman Decl. ¶ 12)

## H.   The Parties' Negotiations and Class Counsel's Due Diligence

Like the UAW, the IUE-CWA also entered into negotiations with GM concerning retiree health care. On April 10, 2006, following comprehensive negotiations, IUE-CWA representatives and GM established the basic framework for modifications to the General Motors Health Care program for Hourly Employees. That framework was embodied in a term sheet entitled "IUE-CWA Healthcare Discussions." (*See* Ex. 58, Ex. 9.) The IUE-CWA and GM term sheet provides that active employees will give up wage and cost of living increases they were entitled to under the current GM/IUE-CWA collective bargaining agreement — concessions estimated to be worth approximately $2,000 per year per active employee. (*Id.* at 1; 10/5/06 Trans.) Active GM/IUE-CWA employees ratified the concessions later in April to help facilitate retirees continuing to receive comprehensive health care benefits. (*Id.*)

Class Counsel conducted a substantial factual investigation and legal inquiry into whether the proposed settlement was fair, reasonable, adequate, and in the best interests of the proposed Class. (Payne Decl. ¶¶ 29-34) Class Counsel also took into consideration the detailed analysis of GM's financial condition they and their retained experts, Gleason and Associates ("Gleason") completed in *UAW v. GM*, as well as the analysis performed in connection with that matter by experts retained by the UAW, Lazard Freres & Co. LLC ("Lazard"). (*Id.* ¶ 33)[2] Class Counsel

---

[2] In connection with the GM/UAW settlement, GM and the UAW engaged in intensive negotiations regarding the impact of health care costs on GM's financial condition. *UAW v. GM*, 2006 U.S. Dist.

reviewed all of the collective bargaining agreements, health care plan documents and Summary Plan Descriptions issued to retirees as well as financial information regarding GM's business operations and the reports generated by specifically retained financial consultants – including Lazard and Gleason from the *UAW v. GM* case. (Payne Decl. ¶¶ 30-33, 39) As a result of this investigation, Class Counsel concluded that the proposed settlement is fair, reasonable, adequate, and in the best interests of the Class. (*Id.*) After Class Counsel completed their analysis, they discussed the results of their investigation, as well as their conclusions, with each of the Class Representatives. (*Id.* ¶ 39) Thereafter, the Class Representatives submitted declarations expressing their support for the settlement and explaining their role in this litigation. (Doc. 8, Exhibits 10-14)

## I.   The Settlement Agreement

GM, the IUE-CWA, and Class Counsel negotiated the final terms of the settlement, which are set forth in the Settlement Agreement. (Doc. 12, Settlement Agreement) The parties' Settlement Agreement addresses GM's financial struggle, modifying the cost structure of GM's hourly retiree health benefit plan for IUE-CWA retirees in order to promote the long-term viability of the company. (Newman Decl. ¶ 23; Raleigh Decl. ¶ 20) Most of the terms of the Settlement are nearly identical to the terms of the settlement approved by the district court in *UAW v. GM*. *See* 2006 U.S. Dist. LEXIS 14890.

The evidence presented shows that the Settlement Agreement is an important component of GM's structural cost reduction plan. (Newman Decl. ¶ 21) Implementation of the Settlement (along with the agreement between IUE-CWA and GM ratified by active hourly workers in April 2006)

---

LEXIS 14890, at *12. GM made available to and the UAW and its independent financial advisor, Lazard, reviewed, comprehensive, highly-confidential information about the company's financial position and plans for the future. *Id.* at *10-12. GM also provided its highly confidential financial information to Class Counsel (the same lawyers appointed to represent the Class in this case), who not only reviewed the detailed Lazard reports, but also retained their own financial advisor, Gleason, to evaluate GM's financial condition. (Payne Decl. ¶ 31)

will contribute approximately $650 million toward achieving GM's goal of reducing its OPEB liability, while minimizing the financial impact on retirees. (Raleigh Decl. ¶¶ 19-20; Mulvey Decl. ¶¶ 23-25) The health care coverage that GM currently provides to members of the Class is comprehensive — covering medical, prescription drug, vision and dental care — and historically has required little, if any, cost contribution from participants for covered services. (Payne Decl. ¶ 22) Previously, Class members did not pay monthly premiums or yearly deductibles. (*Id.*) The Settlement Agreement implements modest changes to this coverage. (Raleigh Decl. ¶ 20; Mulvey Decl. ¶ 30)

Specifically, the Settlement Agreement provides for establishment of a new health care plan, the "Modified Plan," under which there are moderate increases in retirees' cost contribution to health care benefits. (Doc. 12, Settlement Agreement § 3; *see* Mulvey Decl. ¶ 25) For Class Members who do not wish to participate in the Modified Plan, there is a Catastrophic Plan in which they may participate or be enrolled. (Doc. 12, Settlement Agreement §§ 4, 7) In addition, the Agreement protects the most financially vulnerable Class Members ("Protected Retirees," comprising approximately 7,000 households) by continuing, in material respects, the existing coverage for retirees with annual pension benefits below the threshold of $8,000 and who receive a monthly pension benefit rate of $33.33 or less per year of service. (*Id.* § 5; Raleigh Decl. ¶ 20; Mulvey Decl. ¶ 23; Doc. 8, Ex. 1, Payne Decl. ¶ 22)

Class Members who participate in the Modified Plan will have modest premiums, deductibles, and co-insurance. In general, they will pay a $10 premium per month for individual coverage ($21 per month for family coverage) in the first year of the plan. (Doc. 12, Settlement Agreement § 3.A.2.a) The Modified Plan also establishes an annual deductible of $150 for individuals ($300 per family), as well as 10% co-insurance payment for most medical charges. (*Id.* § 3.A.2.b-c) However, a new out-of-pocket maximum will cap deductibles and co-insurance at $250

11

per individual ($500 per family) per year.  (*Id.* § 3.A.2.d)  In the first year of the Modified Plan, these new monthly contributions, annual deductibles, and co-insurance payments translate into annual cost increases of — at most — $370 for a single retiree and $752 for family coverage, plus any prescription and emergency room co-payments.  (Raleigh Decl. ¶ 20; Payne Decl. ¶ 24)

Prescription drug co-payments under the Modified Plan are subject to minimal increases. For drugs purchased at retail, the co-pay increases by just $2.00 — to $7.00 for generic and $12.00 for brand name prescriptions.  (Doc. 12, Settlement Agreement § 3.A.2.f; *compare* Hoffmann Decl. Tab 1, 2003 Supplemental Agreement, App. A, III.G.2.a at 123-24; Raleigh Decl. ¶ 21)  Co-payments for generic mail order prescriptions will increase to $14.00 for a 90-day supply, an increase of just $3.00 per month.  (Doc. 12, Settlement Agreement § 3.A.2.f; *compare* Hoffmann Decl., Tab. 1, 2003 Supplemental Agreement, App. A, III.G.2.a at 123-24; Raleigh Decl. ¶ 21)

Increases in retiree cost contributions under the Modified Plan are capped at 7% per year. (Doc. 12, Settlement Agreement § 3.B)  By contrast, the evidence shows that retiree health care costs such as coinsurance, co-pay, and premium contributions rose 9.9% last year alone, and are expected to increase at a similar rate for the foreseeable future.  (Mulvey Decl. ¶ 26)

The Settlement Agreement also implements reasonable mechanisms to encourage cost-effective choices and ensure that heath care resources are appropriately used.  (*Id.* ¶ 27)  These include a $50 co-payment for emergency room visits (waived if the patient is admitted) and a requirement that enrollees bear responsibility for charges above and beyond reasonable and customary charges if they choose out-of-network providers when network providers are reasonably available.  (Doc. 12 § 3.A.2.e; *Id.* Ex. 1, Administrative Changes, § 3 at 4)

The evidence shows that, even with these cost contributions and other changes, the Modified Plan provides a range of benefits for retirees that substantially exceeds the benefits generally

available to most other retirees under health care plans offered by large U.S. employers, and at a cost that is substantially less than the cost most other retirees pay.  (Mulvey Decl. ¶ 25)

The Settlement Agreement is to govern the parties through September 14, 2011 and may be continued beyond that date.  If the Agreement is not continued the parties have preserved their legal positions and would have the right to resolve any disputes in litigation, if necessary.  (Doc. 12 §§ 17(d), 18)  The Settlement Agreement provides that the court's final judgment will expressly recite and confirm the provisions of Section 18, the "No Prejudice" provision.  (Doc. 12 at 17-19).

## J.    Preliminary Approval And Notice of the Settlement

Following a hearing on August 1, 2006, the Court found that the requirements of Rule 23(a) and 23(b)(2) had been satisfied and certified the Class.  (Doc. 16, Order)  It also preliminarily approved the parties' Settlement Agreement and approved the proposed form and manner of class notice.  (Doc. 17, Order on Joint Mot. for Preliminary Approval of Class Action Settlement Agreement And Proposed Class Notice)  Finally, the Court appointed William T. Payne, John Stember, and Edward J. Feinstein as Class Counsel. (Doc. 16 at 3-4)

GM provided the approved direct mail notice to the Class on August 3, 2006 by mailing Class Notice packets by First Class Mail to each of the 32,000 Class Members.  (Doc. 60, Exhibit E, Declaration of Patrick M. Passarella ("Passarella Decl.") ¶ 7 & Ex. D thereto, Declaration of Drew Disesa)  GM also published the approved publication notice in the Dayton, Ohio area, where many of the retirees are located, in the *Dayton Daily News* and the *Springfield News* (daily Dayton, Ohio newspapers), and nationally in *USA Today*.  (*Id.* ¶ 15)  Each notice described the terms of the Settlement Agreement, informed Class Members of their right to object, the objection procedure, and the date and location of the fairness hearing, and (in the case of mailed notice) included a summary of the Settlement Agreement in a letter from IUE-CWA and Class Counsel and a complete copy of the Settlement Agreement.  (*Id.*, Exs. A & C)

13

Finally, GM issued notice to the appropriate federal and state attorneys general pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1715(b).  (Passarella Decl. ¶¶ 11-14)  None submitted an objection.

### K.    Objections and Fairness Hearing

Only 34 objections were filed by 37 retirees and spouses out of more than 32,000 Class Members — representing about one-tenth of one percent of the Class.[3]  Using the ratio of objectors to Class Members, if the Class had consisted of 1,000 members, only one would have objected.

The court conducted a fairness hearing on October 5, 2006.  The court heard from counsel for all parties.  Although each Class Notice informed Class Members of the date of the fairness hearing and their right to attend that hearing, no objector made a personal appearance at the hearing.

### L.    Attorney's Fees and Expenses

The Settlement Agreement provides that GM will not oppose an application by the IUE-CWA and Class Counsel for reimbursement by GM of reasonable attorney and professional fees and expenses for hours worked in an amount to be determined in accordance with current market rates (not to include arrangements such as any contingency fees, success fee, completion bonus or rate premiums), incurred in connection with the court proceedings to obtain the Judgment approving this Settlement Agreement.  (Doc. 12, Settlement Agreement, at 5).  The Settlement Agreement provides that approval of these fee requests will be included in the Court's judgment. (*Id.*)  On August 18, 2006, Class Counsel filed a motion for their attorneys' fees and expenses. (Doc. 21).

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction

---

[3]*See* Docket Nos. 19, 20, 22-53.

The court has jurisdiction under Section 301 of the LMRA, 29 U.S.C. § 185, and Section 502(e)(1) and (f) of ERISA, 29 U.S.C. § 1132(e)(1) and (f).

**B.    Class Certification**

On August 1, 2006, the Court entered an order certifying the Class in this case under Rule 23(a) and 23(b)(2).  To be certified, a proposed class must meet the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy), and one of the three Rule 23(b) standards.  *See, e.g., General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982).  Each requirement is met in this case.  Based on the subsequent record and the fairness hearing, the Court confirms class certification.

Numerosity:  There are approximately 32,000 individuals in the plaintiffs' class, making the class "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see, e.g., Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 n.1 (6th Cir.1997) (objection to numerosity requirement in 1,000-member class was "frivolous"); *Reese v. CNH Am. LLC*, 227 F.R.D. 483, 486 (E.D. Mich. 2005) (certifying claims of 1,400 retirees); *Rankin v. Rots*, 220 F.R.D. 511, 517 (E.D. Mich. 2004) (certifying ERISA claims for class alleged to be in the "thousands").

Commonality:  Rule 23(a)(2) "'simply requires a common question of law or fact.'"  *Reese*, 227 F.R.D. at 487 (quoting *Bittinger*, 123 F.3d at 884); *see Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc).   "'The interests and claims of the various plaintiffs need not be identical.   Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members.'"  *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *31-32 (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422 (6th Cir. 1998)).  In this case, the question of whether GM has the right unilaterally to modify retiree benefits, as it claims, is a question of law common to the class.  *See Bittinger*, 123 F.3d at 879, 884 (commonality existed where retirees sought guaranteed lifetime, fully-funded benefits, even though

a series of different CBAs governed those benefits); *Reese*, 227 F.R.D. at 487 (commonality established even though plaintiffs retired at different times and under different CBAs); *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *32; *UAW v. Ford Motor Co.*, Nos. 05-74720, 06-10331, 2006 WL 1984363, at *114 (E.D. Mich. July 13, 2006).

Typicality:  Under Rule 23(a), a "'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'"  *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir.1996) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3-13, at 3-76).  Like commonality, the typicality requirement is not onerous, and is satisfied if there is a strong similarity of legal theories, "even if substantial factual distinctions exist between the named and unnamed class members." *Rankin*, 220 F.R.D. at 518; *see Bittinger*, 123 F.3d at 884-85; *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *33.  Plaintiffs' claim – that GM's plan to unilaterally modify retiree health care benefits violates ERISA and GM's contractual obligations under the collective bargaining agreements – asserts a uniform obligation by GM, and therefore satisfies typicality.  *See Bittinger*, 123 F.3d at 884 (claim that defendant "originally planned to provide lifetime, fully-funded benefits to retirees" satisfies typicality); *Reese*, 227 F.R.D. at 487; *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *33-34.

Adequacy of Class Representatives and Counsel: There are two criteria for determining whether class representatives are adequate: "1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute interests of the class through qualified counsel."  *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir.1976); *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *34.  The class representatives in this case have the same, common interest in protecting retiree health care benefits, and there is nothing to suggest that they do not or would not vigorously protect the interests of the

16

class.  *See, e.g., Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997) (class members must "possess the same interest and suffer the same injury" to meet the adequacy requirement).

With respect to the adequacy of class counsel, the court must consider: (a) the work counsel has done in identifying or investigating potential claims in the action, (b) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (c) counsel's knowledge of the applicable law, and (d) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(C).

As set forth in this Court's August 1, 2006 Order granting class certification, Class Counsel in this case satisfy these criteria.  Class Counsel's work in this case is further discussed below.

Class Counsel are well qualified and possess the resources to represent the class.  In addition, Class Counsel thoroughly understand the issues, have extensive knowledge of the law relating to retiree benefits litigation, and have litigated dozens of actions of this kind.  *See UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *37.  William T. Payne has litigated approximately fifty cases involving retiree health benefit class actions in his career.  Mr. Payne has authored several papers discussing litigation involving retirement benefits and frequently lectures on the subject of retiree health benefit litigation at Continuing Legal Education conferences.  (Motion for Attorney Fees, p. 9, n. 2 and Exs. 3 and 4) John Stember has been in practice for nearly 30 years and has been involved in litigating retiree health class actions since 1993.  Mr. Stember co-authored an article on litigating retiree health benefit cases on behalf of union retirees.  (Motion for Attorney Fees, pp. 9-10 and Exs. 5 and 6) Edward J. Feinstein has also been in practice for more than 30 years, has litigated numerous class action law suits in his career and currently devotes 75% of his time litigating retiree health class actions.  (Motion for Attorney Fees, Ex. 7) Jere Krakoff has also been practicing for more than 30 years and has litigated numerous class actions, including several retiree health class action cases. (Motion for Attorney Fees, Ex. 8)

This case is properly certified under Rule 23(b)(2) because "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  This standard is met when "the common claim is susceptible to a single proof and subject to a single injunctive remedy."  *Senter*, 532 F.2d at 525.  Numerous courts, including this one, have certified claims challenging an employer's modification of health care benefits under Rule 23(b)(2), holding that in such cases, the employer's alleged conduct is directed at the class as a whole and class-wide injunctive or declaratory relief is therefore appropriate. *See Forbush v. J.C. Penny Co.*, 994 F.2d 1101, 1106 (5th Cir.1993); *Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 665 (E.D. Mich. 1995) ("[I]t is abundantly clear that the ... decision by [defendant] with regard to the then-existing health care benefits affected the entire proposed class, thus making the issue of a permanent injunction and corresponding declaratory relief facially appropriate."); *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *38-39; *UAW v. Ford*, 2006 WL 1984363, at *58-59.  Here, plaintiffs' claims are all based on the contested question of whether GM may unilaterally modify retirees' health care benefits, which is "susceptible to a single proof and subject to a single injunctive remedy," and is therefore properly certified under Rule 23(b)(2).  *Senter*, 532 F.2d at 525; *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *39.

Finally, while no issue or objection has been raised concerning the class notice in this case, the Court again finds that such notice was proper and adequate.  Under Rule 23(e)(1)(B), Class Members must be given notice of a proposed settlement that is "'reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *98 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  The notice "'must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of

the options that are open to them in connection with [the] proceedings.'" *Grunin v. Int'l House of Pancakes, Inc.*, 513 F.2d 114, 122 (8th Cir. 1975) (quoting *Philadelphia Housing Auth. v. Am. Radiator & Standard Sanitary Corp.*, 323 F.Supp. 364, 378 (E.D. Pa. 1970), *aff'd*, 453 F.2d 30 (3d Cir.1971)); *UAW v. Ford*, 2006 WL 1984363, at *114.

The notice approved by this court on August 1, 2006, which was mailed to the approximately 32,000 members of the Class immediately thereafter, satisfies these standards. The notice explained the background and basis of this litigation, summarized the terms of the proposed settlement, including the right of Class Members to object, and even included a complete copy of the Settlement Agreement. In addition, the notice was provided by publication in three newspapers, including one (*USA Today*) with a national distribution. Such notice, which is very similar to the notice approved in *UAW v. GM,* "fully meets the definition of 'reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections,'... and clearly satisfies the standards of due process." 2006 U.S. Dist. LEXIS 14890, at *104 (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 231 (D. N.J. 1997)); *see, e.g., Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 489 (1988) (mailed notice "is reasonably calculated to provide actual notice"); *Weinberger v. Kendrick*, 698 F.2d 61, 69-71 (2d Cir.1982).

Accordingly, the Court GRANTS final certification of the class defined above in the Findings of Fact.

### C.    Final Approval Of The Class Settlement

The court should approve a class settlement if, following a hearing, the court determines that the settlement "is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C). In making this determination, the court evaluates the proposed class action settlement "in light of the general federal policy favoring the settlement of class actions." *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890,

at *39; *see Clark Equip. Co. v. Int'l Union, Allied Indus. Workers*, 803 F.2d 878, 880 (6th Cir. 1986) (per curiam); *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981), *vacated and modified on other grounds*, 670 F.2d 71 (6th Cir. 1982).

Given that class settlements are favored, the role of the district court is "'limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'" *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *40 (quoting *Clark Equip. Co.*, 803 F.2d at 880); *see UAW v. Ford*, 2006 WL 1984363, at *21 ("the district court is 'limited to a determination of whether the terms proposed are fair and reasonable to those affected'") (quoting *Steiner v. Fruehauf*, 121 F.R.D. 304, 305 (E.D. Mich. 1989); *Berry v. Sch. Dist.*, 184 F.R.D. 93, 97 (W.D. Mich. 1998); *Shy v. Navistar Int'l Corp.*, No. C-3-92-333, 1993 U.S. Dist. LEXIS 21291 (S.D. Ohio May 27, 1993); *see also* Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1797.5 ("The role of the judge at the settlement hearing is strictly limited").

In exercising this role, the court must respect the parties' compromise and may not "substitute his or her judgment for that of the litigants and their counsel." *Berry*, 184 F.R.D. at 97; *see UAW v. Ford*, 2006 WL 1984363, at *21.  This is because "'there is a range of reasonableness with respect to a settlement — a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *see In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) (evaluating settlement under "range of reasonableness").

The evaluation and approval of a class settlement is committed to the sound discretion of the district court.  *Clark Equip. Co.*, 803 F.2d at 880; *UAW v. Ford*, 2006 WL 1984363, at *21; *Detroit*

*Police Officers Ass'n v. Young*, 920 F. Supp. 755, 761 (E.D. Mich. 1995).  In exercising that discretion, the court "may limit the fairness hearing 'to whatever is necessary to aid it in reaching an informed, just and reasoned decision,'" *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 567 (6th Cir. 2001) (quoting *United States v. Oregon*, 913 F.2d 576, 582 (9th Cir. 1990)); *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *42-43.  "The court may consider briefs, declarations, affidavits and the arguments of counsel and need not conduct an evidentiary hearing or take live testimony."  *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *42 (citing *Tenn. Ass'n of Health Maint. Orgs., Inc.*, 262 F.3d at 567); *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994) ("there is no requirement that an evidentiary hearing be conducted as a precondition to approving a settlement in a class action suit"); *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 527 (1st Cir. 1991) (same); *see also* 4 NEWBERG ON CLASS ACTIONS §7 11:57.  The "'settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits.'" *UAW v. Ford*, 2006 WL 1984363, at *21 (quoting *Officers for Justice v. Civil Serv. Comm'n.*, 688 F.2d 615, 625 (9th Cir. 1982)).

Finally, factors  relevant to the court's evaluation of a class settlement are:  (i) "the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement; (ii) the risks, expense, and delay of further litigation; (iii) the judgment of experienced counsel who have competently evaluated the strength of their proofs; (iv) the amount of discovery completed and the character of the evidence uncovered; (v) whether the settlement is fair to the unnamed class members; (vi) objections raised by class members; (vii) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and (viii) whether the settlement is consistent with the public interest."  *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *44-45; *In re Cardizem*, 218 F.R.D. at 522; *see also, e.g.*, *UAW v. Ford*, 2006 WL 1984363, at *22; *Berry*, 184 F.R.D. at 98.  The court "may choose to consider only those factors that are relevant to

21

the settlement and may weigh particular factors according to the demands of the case." *UAW v. Ford*, 2006 WL 1984363, at *22 (citing *Granada Invest., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205-06 (6th Cir. 1992)).

        1.      **The likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement.**

In weighing the likelihood of success on the merits against the relief offered in the litigation, the "ultimate question ... is 'whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.'" *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *46 (quoting *In re Cardizem*, 218 F.R.D. at 522; MANUAL FOR COMPLEX LITIG. ("MCL") § 30.42 at 238 (3d ed. 1995)); *see Shy*, 1993 U.S. Dist. LEXIS 21291, at *11 ("It is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate and reasonable.") (citing *Clark Equip. Co.*, 803 F.2d 878).  Although this factor requires "'some evaluation of the merits of the dispute, the district court must refrain from reaching conclusions upon issues which have not been fully litigated.'" *Berry*, 184 F.R.D. at 98 (quoting *Armstrong*, 616 F.2d at 314); *see UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *46.

        *a.  The Issue of Whether Retiree Health are Benefits are Vested.*

The core issue in this case is whether retiree health care benefits are vested, or instead can be unilaterally modified or even terminated by GM.  GM, the IUE-CWA, and the Class all agree that the merits of their dispute are sharply and deeply contested, and they make a variety of arguments in support of their respective positions, each maintaining that the law and facts favor their respective positions.  This Court finds that this threshold dispute is genuine and its outcome sufficiently uncertain to warrant consideration in assessing the fairness of any settlement.  In reviewing the Settlement, however, the Court need not, and, indeed, should not decide the vesting issue.  This is

because, as noted above, "the very point of compromise is to avoid determining contested issues and to avoid the expense and uncertainty of litigation," and the Court therefore "***should not 'decide the merits of the case or resolve unsettled legal questions.***'"   *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *41 (quoting *Carson v. Am. Brands*, 450 U.S. 79, 88 n.14 (1981)) (emphasis added); *Clark Equip. Co.*, 803 F.2d at 880 (court should not examine "the factual or legal disputes which underlie the merits of the dispute"); *see Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir. 1974) (trial court does not "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute").

Because the parties have elected to avoid litigation through settlement, the court "ought not engage in the 'detailed and thorough investigation that it would undertake if it were actually trying the case.'"   *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *42 (quoting *Berry*, 184 F.R.D. at 98) (additional internal citation omitted); *see Armstrong v. Bd. of Sch. Directors*, 616 F.2d 305, 315 (7th Cir. 1980)); *Grinnell Corp.*, 495 F.2d at 462; Fed. Prac. & Proc. § 1797.5 ("The court may not try disputed issues in the case since the whole purpose behind a compromise is to avoid a trial. .... Rather the judge is restricted to determining whether the terms proposed are fair and reasonable."). The parties recognize that litigation carries substantial risks and uncertainty.  For retirees, a ruling that their health care benefits are not vested "would mean that GM is free not merely to *modify* those benefits but to *eliminate* them," with potentially catastrophic consequences for the class.  *See UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *49.  For GM, a ruling that benefits are vested would hinder its turnaround plans and its ability to address the financial drain caused by retiree health care costs.  Considering "GM's financial condition and the potential for dire consequences to the Class of a outright loss in litigation," it is entirely reasonable and appropriate for the parties to resolve, rather than litigate, their dispute.  *Id.* at 52.

### b. Benefits of the Settlement.

Settlements involve compromise, and "[c]ourts routinely recognize that settlements never equal the full value of the loss claimed by the plaintiffs." *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *52. The reason is that, "'[a] just result is often no more than an arbitrary point between competing notions of reasonableness.'" *UAW v. Ford*, 2006 WL 1984363, at *21 (quoting *In re Corrugated Container Antitrust Litig. (II)*, 659 F.2d 1322, 1325 (5th Cir. 1981)). In assessing the settlement, the court must determine whether it falls within this "range of reasonableness," and "'not whether it is the most favorable possible result in the litigation.'" *UAW v. Ford*, 2006 WL 1984363, at *21 (quoting *In re Domestic Air Transp. Antitrust Litig*., 148 F.R.D. 297, 319 (N.D. Ga. 1993)); *see UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *53; *Fisher Bros. v. Cambridge-Lee Indus*., 630 F. Supp. 482, 489 (E.D. Pa. 1985)).

The benefits to the Class from the Settlement are substantial, maintaining as it does essentially comprehensive medical coverage with extremely modest retiree contributions. The Settlement also provides necessary cost savings to GM, and is an important component of its turnaround plans. The agreement in this case involves virtually identical terms to the agreement approved by Judge Cleland in the *UAW v. GM* case, and the undisputed evidence establishes that, like the class settlement in that action, "the Modified Plan provides a range of benefits for retirees that substantially exceeds the benefits generally available to most other retirees with employer-sponsored retiree health care plans, and at a cost that is substantially less than the cost most other retirees pay." *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *53. A decision to accept modest cost increases in order to obtain assured relief for the Class is reasonable and appropriate. *UAW v. Ford*, 2006 WL 1984363, at *22-23; *Enter. Energy Corp. v. Columbia Transmission Corp.*, 137 F.R.D. 240, 246 (S.D. Ohio 1991) (citing *Williams v. Vukovich*, 720 F.2d 909, 921-922 (6th Cir. 1983)); *see Priddy*, 883 F.2d at 447 (6th Cir. 1989) ("The fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement."); *Schaefer v.*

24

*Tannian*, 895 F. Supp. 175, 178 (E.D. Mich. 1995) ("The court need not disapprove the settlement because a plaintiff might have received more if the case had been fully litigated").

Because the Settlement continues comprehensive health care coverage and benefits to retirees with only a modest increase in cost, it is fair, reasonable, and adequate, particularly when "weighed against the uncertainties of litigation and the risks posed by GM's undisputed distressed financial condition." *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *53-54.

### 2.     The risk, length and expense of further litigation.

Whatever the relative merits of the parties' positions, there is no such thing as risk-free, expense-free litigation. Indeed, "[c]omplex litigation of this sort is costly and time-consuming, as demonstrated by previous cases in this circuit involving modifications to retiree benefits." *Id.* at *54 (citing *Sprague*, 133 F.3d 388 (6th Cir. 1998) (en banc) (upholding, after 9 years of litigation, GM's right to modify salaried retiree benefits)); *see Bittinger v. Tecumseh Prods.*, 201 F.3d 440 (6th Cir. 1999) (per curiam) (affirming, after 8 years of litigation, employer's right to modify benefits). "The obvious costs and uncertainty of such lengthy and complex litigation weigh in favor of settlement." *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *54; *In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2002) ("the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court.... The prospect of such a massive undertaking clearly counsels in favor of settlement.") (internal quotation marks and citations omitted).

Equally important, avoiding the delay necessary to litigate the dispute is in all parties' interest. For GM, delay in achieving retiree heath care cost reduction further erodes the confidence of creditors, investors, GM shareholders, financial and credit markets, car buyers and the media, and will deplete cash which The Company needs to develop and produce competitive vehicles. For the Class and the IUE-CWA, without a significant reduction in GM's retiree health care costs, the

ability of GM to provide health care benefits over the long term at or near the level provided by the

Settlement Agreement would be placed in doubt.  In addition, success at litigation (for either side)

may prove illusory — a prospect that makes settlement an entirely reasonable course:

> "It was reasonable and appropriate for the plaintiffs to conclude, in light of
> GM's dire financial circumstances, that the interest of GM retirees lay not in
> achieving a Pyrrhic victory in court but in actually continuing to receive their
> health care benefits and that the best means to that end lay in making
> reasonable concessions in settlement now in order to increase the likelihood
> that GM could survive in a form in which it could continue to pay the
> retirees' benefits.  Their judgment is entirely appropriate and reasonable
> under the circumstances of this case."

*UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *50-51; *see UAW v. Ford*, 2006 WL 1984363, at *23;

*In re Rio Hair Naturalizer Prods. Liab. Litig*., MDL No. 1055, 1996 U.S. Dist. LEXIS 20440, at

*40-41 (E.D. Mich. Dec. 20, 1996) ("a victory by Plaintiffs at trial, given Defendants' limited funds,

would be pyrrhic"); *Shy*, 1993 U.S. Dist. LEXIS 21291, at *46 ( "Even if the retirees prevail on [the

vesting issue], ... it would inevitably lead to Navistar's liquidation which would cause greater

hardship to the retirees than will be caused by approval of the settlement agreement.").

### 3. The judgment of experienced counsel who have competently evaluated the strength of their proofs.

The judgment of the parties' counsel that the settlement is in the best interest of the settling

parties "is entitled to significant weight, and supports the fairness of the class settlement."  *UAW v.

GM*, 2006 U.S. Dist. LEXIS 14890, at *57 (citing *Mich. Hosp. Ass'n v. Babcock*, No. 5:89-CV-

00070, 1991 U.S. Dist. LEXIS 2058, at *6 (W.D. Mich. Feb. 11, 1991) ("It is ... well recognized that

the court should defer to the judgment of experienced counsel who has competently evaluated the

strength of the proofs.")); *see Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("the trial court

is entitled to rely upon the judgment of experienced counsel for the parties"); *UAW v. Ford*, 2006

WL 1984363, at *25.

Counsel for the parties in this case are reputable practitioners and trial counsel experienced in complex class action litigation who have adequately assessed the strengths of their respective claims and positions. *See UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *51, 57. "Under the law, their collective judgment in favor of the Settlement is entitled to considerable weight." *Id.* at *57-58 (citing *Ass'n for Disabled Americans, Inc.*, *Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("the Court must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel'") (citation omitted)); *UAW v. Ford*, 2006 WL 1984363, at *25.

### 4. The amount of discovery completed and the character of the evidence uncovered.

It is settled that in order to evaluate a proposed settlement, the court need not possess sufficient "'evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation.'" *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *59 (quoting NEWBERG § 11:45); *see In re Rio Hair Naturalizer*, 1996 U.S. Dist. LEXIS 20440, at *39-40. "Instead, the district judge need only have 'sufficient facts before [him] to intelligently approve or disapprove the settlement.'" *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *59-60 (quoting *Epstein v. Wittig*, No. 03-4081-JAR, 2005 U.S. Dist. LEXIS 31078, at *23-24 (D. Kan. Dec. 2, 2005)); *see Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1084 n.6 (6th Cir. 1984); *UAW v. Ford*, 2006 WL 1984363, at *25. That the parties conducted their investigation through informal discovery, or based on information assembled in a related case, is not unusual or problematic, so long as they and the court have adequate information in order to evaluate the parties' relative positions. *See Newby v. Enron Corp.*, 394 F.3d 296, 306 (5th Cir. 2004) ("'[F]ormal discovery [is not] a necessary ticket to the bargaining table.'"); *Cotton*, 559 F.2d at 1332 (upholding settlement despite the fact that little formal discovery had been conducted; "Being an extra judicial process, informality in the discovery of

information is desired"); *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991) ("documents filed by plaintiffs and evidence obtained through informal discovery yielded sufficient undisputed facts" to evaluate the settlement); *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *58-59; *Hemphill v. San Diego Ass'n of Realtors*, 225 F.R.D. 616, 619 (S.D. Cal. 2004) (counsel may rely on information assembled in related case).

Here, Class Counsel has had access to and examined all of the relevant collective bargaining agreements, health care plan documents and Summary Plan Descriptions issued to retirees. GM also provided full disclosure to the Class of GM's business and financial condition, including GM's health care liability. Class Counsel also had access to the analysis of GM's financial condition conducted by the financial consultants, Lazard and Gleason, in the context of the GM/UAW Class settlement litigation. Given this, "there was significant information available to the parties to negotiate their compromise, and there is more than an adequate basis and evidentiary record on which the court can assess the parties' agreement." *GM v. UAW*, 2006 U.S. Dist. LEXIS 14890, at *60.

**5.    Whether the Settlement is fair to unnamed class members.**

"Courts may [also] scrutinize settlements to determine whether absent class members have lost out in favor of attorneys and named class members." *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *60. There is no such concern in this case. GM's asserted right to terminate or modify benefits would affect similarly-situated Class Members the same, and thus the Class is cohesive and the members share a unitary interest in maximizing the benefits secured by compromise. *See, e.g.*, *Heit v. Van Ochten*, 126 F. Supp. 2d 487, 490-491 (W.D. Mich. 2001); 5-23 Moore's Federal Practice § 23.164. In addition, Class Counsel's fee petition (discussed further below) is based solely on hours worked at a reasonable rate, and not a premium or contingency fee arrangement, and poses no issue of preference. *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *66.

      6.      **Whether the Settlement is the product of arm's-length negotiations as opposed to collusive bargaining.**

Courts presume the absence of fraud or collusion unless there is evidence to the contrary. *In re Rio Hair Naturalizer*, 1996 U.S. Dist. LEXIS 20440, at *43 ("Courts respect the integrity of and presume good faith in the absence of fraud or collusion in settlement negotiations, unless someone offers evidence to the contrary"); *see Granada Invest., Inc.,* 962 F.2d at 1205 ("Absent evidence of fraud or collusion, such settlements are not to be trifled with."); *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *63-64; *Hemphill v. San Diego Ass'n of Realtors*, Inc., 225 F.R.D. 616, 621 (S.D. Cal. 2005); Newberg (4th) § 11:51.

Here, there is an ongoing adversarial relationship between the Class/IUE-CWA and GM on the question of GM's right to unilaterally change, modify, or terminate health care benefits and the parties are in fundamental and irreconcilable disagreement on this issue. The evidence shows that the Settlement was the result of negotiations informed by the exchange and evaluation of extensive information, and there is no suggestion, much less any evidence, to the contrary. This process was entirely at arm's length, with each party representing and pursuing its own interests, and exercising independent judgment.

The authorities hold that if the settlement agreement itself is fair, reasonable and adequate, then the court may assume that the negotiations were proper and free of collusion. *E.g.*, *UAW v. Ford*, 2006 WL 1984363, at *26; *Bowling v. Pfizer, Inc*., 143 F.R.D. 141, 152 (S.D. Ohio 1992) ("In essence, under this test, if the terms of the proposed settlement are fair, then the court may assume the negotiations were proper."), citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) ("It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting."). This presumption is conclusive here because there is no evidence of collusion.

29

Finally, in considering this factor and, in particular, whether the negotiations were free of collusion, "some courts look to whether (1) the named plaintiffs' claims are treated more favorably than other plaintiffs' claims, and (2) the fee agreement suggests collusion." *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *66 (citing *Heit v. Van Ochten*, 126 F. Supp. 2d 487, 490-491 (W.D. Mich. 2001)); *see UAW v. Ford*, 2006 WL 1984363, at *26.

As set forth above, the parties' Settlement Agreement provides no preference to the Class Representatives' claims, which are treated no differently than the claims of any other Class Member. There is likewise no suggestion of collusion in Class Counsel's fee petition, which, as noted, only seeks fees for hours worked at a reasonable rate. Similarly, the settlement agreement caps fees for in-house IUE-CWA counsel at $4,000, based on hours worked, and also provides for GM's payment of IUE-CWA's outside counsel's reasonable attorney and professional fees and expenses for hours worked in an amount to be determined in accordance with current market rates. (Doc. 12, Settlement Agreement at 12); *see UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *66 (concluding that such an arrangement was "remarkably modest for litigation of this nature" and raised no concern about collusion).

### 7.     Whether the settlement is consistent with the public interest.

There is no question that GM's continued viability has a profound effect on the economies of Michigan, Ohio, and indeed the nation as a whole. As Judge Cleland observed in *UAW v. GM*:

> "the evidence submitted shows that approximately one million Americans earn their livelihood building and selling GM vehicles and another half million [in the U.S.] depend on GM for their pensions. In addition, GM spends billions of dollars in capital investments, purchases of parts and supplies, and expenditures for research and development. GM is Michigan's largest employer, with over 71,000 residents on its payroll, and approximately 165,000 retirees in the area."

2006 U.S. Dist. LEXIS 14890, at *66-67. GM also has a substantial presence in Ohio, with more than 25 sites, 18,000 employees, and more than 62,000 retirees. Indeed, "[a]ll of this economic

activity depends on GM's continued viability, which depends in part on GM being able to effectively manage and control its health care costs." *Id.* at *67.

The evidence shows that, with an unfunded U.S. APBO liability in excess of $40 billion, it is necessary for GM's efforts in this regard to continue, and the parties' Settlement Agreement is an indispensable component of GM's structural cost reduction plan. The Settlement also serves the public interest "by conserving the resources of the parties and the court, and by promoting the 'strong public interest in encouraging settlement of complex litigation and class action suits.'" *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *67 (quoting *In re Cardizem*, 218 F.R.D. at 530); *see Lipuma v. Am. Express Co.*, 2005 U.S. Dist. LEXIS 38010, at *77 (S.D. Fla. Dec. 20, 2005) ("'settlement will alleviate the need for judicial exploration of these complex subjects, reduce litigation cost, and eliminate the significant risk that individual claimants might recover nothing'") (citation omitted).

### 8.    Objections raised by class members.

"A court should not withhold approval of a settlement merely because some class members object." *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058, at *10; *Robinson v. Ford Motor* Co., No. 1:04-CV-00844, 2005 U.S. Dist. LEXIS 11673, at *16 (S.D. Ohio June 15, 2005); *Reed v. Rhodes*, 869 F. Supp. 1274, 1281 (N.D. Ohio 1994); *Enter. Energy Corp.*, 137 F.R.D. at 246; FED. PRAC. & PROC. § 1797.1 ("the fact that there is opposition does not necessitate disapproval of the settlement"). "This is because even though the court must evaluate any objections, it 'has an obligation to protect the interests of the silent class majority, despite vociferous opposition by a vocal minority to the settlement.'" *UAW v GM*, 2006 U.S. Dist. LEXIS 14890, at *61 (quoting *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058, at *10).

This case involves very few objections to the parties' Settlement. Out of more than 32,000 class members, only 37 individuals – about one-tenth of one percent – submitted 34 objections. This

extremely minimal level of opposition represents significant support by the Class for the Settlement Agreement. *See Robinson*, 2005 U.S. Dist. LEXIS 11673, at *17 ("a relatively small number of class members who object is an indication of a settlement's fairness") (citing NEWBERG § 11.48); *In re Cardizem*, 218 F.R.D. at 527 (the small number of objections received is "indicative of the adequacy of the settlement"); *Berry*, 184 F.R.D. at 106 ("the minimal opposition suggests that the class as a whole is in favor of the agreements"); *Lazy Oil Co.*, 95 F. Supp. 2d at 332 ("'[i]n the class action context, silence may be construed as assent'"); *see also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (objections by only 10% of the class "strongly favors settlement"); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th cir. 1999) (approving settlement where objectors represented fewer than 4% of the class); *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *62 (approving settlement where objectors were less than three-tenths of one percent of the class); *Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (class settlement approved despite objections from more than 10% of class).

Of the small number of objections, almost one third (10) state no basis whatsoever for the objection. "Because there is no way for the court to determine the basis for these objections or whether any such objections have merit, they are of little use." *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *68; *In re Rio Hair Naturalizer*, 1996 U.S. Dist. LEXIS 20440, at *43 ("General objections without factual or legal substantiation carry little weight") (quoting 2 NEWBERG (3d) § 11.58); *see also Fussell v. Wilkinson*, 2005 U.S. Dist. LEXIS 30984, at *11-12 (S.D. Ohio 2005); FED. PRAC. & PROC. § 1797.1 ("Only clearly presented objections...will be considered")

### a.      Objection that retiree health care benefits are "vested"

Only 24 objections (representing fewer than eight-hundredths of one percent of the class) identified any basis for the objection. Of these, the greatest number (19) assert that the settlement should not be approved because retiree health care benefits are "vested." However,"*[a]*

*disagreement over the merits of the parties' dispute ... is not a basis for disapproving the settlement*." *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *69 (emphasis added); *see Laskey v. UAW*, 638 F.2d 954, 957 (6th Cir. 1981) ("the objections made indicated these employees did not want to compromise at all but wanted full benefits, rather than making any complaint directed to the adequacy of their legal representation"); *In re Wash'n Pub. Power Supply System Sec. Litig.*, 720 F. Supp. 1379, 1394 (D. Ariz. 1989) (rejecting objections based on "fallacious" assumption that "the case assured certain victory for Plaintiffs").

The parties' disagreement about vesting is the very dispute that is being settled, and their evaluation of the merits of their respective positions has already been weighed in their decision to compromise. *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *71.

### b.  Objection that modifications will be a hardship

The next most common objection, made by 16 class members, is that the cost contributions under the Modified Plan would impose a financial hardship on them.  While it is understandable that certain members of the Class are concerned about the impact of rising health care costs, the evidence shows that the parties have sought to minimize the effects of the Settlement on the most financially vulnerable Class Members ("Protected Retirees") by retaining their comprehensive benefits without any monthly premium contributions, deductibles, or co-insurance.  Preservation of comprehensive retiree benefits, while accomplishing the cost saving necessary to GM's continued competitiveness is central to the parties' compromise.

In addition, the view of some individuals that, because of their particular circumstances, the cost contributions are unduly burdensome must be balanced against the goal of retaining comprehensive coverage for the Class as a whole.  *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *108; *see Shy*, 1993 U.S. Dist. LEXIS 21291, at *49-50 (approving settlement notwithstanding retirees' objections based on financial hardship).

The Court has a duty to protect the interests of the majority of class members who have overwhelmingly approved the compromise. *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058, at *10. The alternative to settlement for the entire Class of retirees (including the few who submitted objections) would likely be worse and would jeopardize the very benefits they seek to preserve. *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *108; *Shy*, 1993 U.S. Dist. LEXIS 21291, at *8 ("the hardship which [defendant's] retirees will be forced to endure if the settlement agreement is approved is substantially and significantly less than that which will be imposed upon them if the agreement is rejected").

**c.      Objection that retirees were not allowed to "vote" on the Settlement.**

A few class members (6) have objected that they were unable to "vote" on the settlement. This objection does not address any aspect of the settlement and shows a misunderstanding of the requirements of Rule 23 generally and Rule 23(b)(2) in particular:

> "***A vote by class members is not the means provided by Rule 23(e) for ensuring the fairness of a class action settlement***.   Rather, the class members' interests are protected by Rule 23(a)'s requirements such as commonality and adequacy, and by the fact that class members may not be bound to a compromise without independent judicial review to ensure that the proposed settlement is fair, reasonable, and adequate."

*UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *71 (citing Fed. R. Civ. P. 23(e)(1)(C)) (emphasis added).  Accordingly, these objections provide no basis to reject the settlement.

**d.      Objection that GM's financial problems were caused by management.**

An even smaller number of class members (4) assert that GM's financial problems were caused by (and/or the consequences should borne by) GM management.  However, this objection sheds no light on the fairness of the Settlement.  *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *109.  "'[W]hether or not [defendant's] management operated poorly in the past is simply not

34

relevant to the issues presently before the Court.'" *Id.* (quoting *Shy*, 1993 U.S. Dist. LEXIS 21291, at *45). Furthermore, this objection ignores the contributions and sacrifices required under GM's turnaround plan from other constituencies, including the company's officers, management, board of directors, salaried employees, salaried retirees, active hourly employees, suppliers, and shareholders, as well as the reduction to hourly retiree benefits already approved for retirees formerly represented by the UAW. *See UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *109.

### e.  Other objections

Finally, the remaining objections (5) take issue with particular terms of the Settlement or suggest that the IUE-CWA somehow acted improperly in entering into the Settlement. These objections offer no basis to disapprove the Settlement. "In considering the extent and significance of the objections, 'the Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis.'" *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *16-17 (emphasis added); *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058 at *11-12; *see* MCL (4th) § 21.643 ("Unless a number of class members raise similar objections, individual objectors rarely provide much information about the overall reasonableness of the settlement").

Furthermore, there is no evidence whatsoever of any improper conduct by any party to the Settlement. *See Granada Invest., Inc.*, 962 F.2d at 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with.") (emphasis added); *In re Rio Hair Naturalizer*, 1996 U.S. Dist. LEXIS 20440, at *15 (courts "presume good faith in the absence of fraud or collusion in settlement negotiations, unless someone offers evidence to the contrary"); *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *63-64 (same). Just the opposite, with respect to the IUE-CWA in particular, active IUE-CWA-represented employees will divert wage and COLA payments earned by their labor (estimated at approximately $2,000 per year) to contribute to funding health

benefits for both retirees and active employees – which underscores the fairness and reasonableness of the Settlement.

These objections – representing the individual views of a small fraction of the Class – "cannot overrule the views of the overwhelming majority of the Class, nor the Court's determination that the settlement is fair, reasonable, and adequate, and should be approved." *See UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *110.

### D.      Motion For Fees And Expenses

On August 18, 2006, Class Counsel filed a motion for attorneys' fees and expenses reflecting their work as of that date. The Court finds that Class Counsel's hourly rates are appropriate and, given the extensive legal work performed, the Court approves a request for reasonable fees and expenses by Class Counsel pursuant to Settlement Agreement § 12. The Court will rule on the October 18 motion in a separate order. Further, it will determine the exact amount of Class Counsel's total fees and expenses after a motion made within 14 days of the date of this ruling pursuant to Rule 54(d)(2). The IUE-CWA is to file its motion or a proposed stipulated order providing for reasonable attorney and professional fees, also pursuant to § 12 of the Settlement Agreement, within 14 days after judgment pursuant to Rule 54(d)(2), and the court will rule on the IUE-CWA's request in a separate order.

### E.      Settlement Is Without Prejudice

The parties have agreed that in the event the Settlement Agreement is terminated pursuant to its Sections 16 or 17, all parties will remain protected by the "No Admissions; No Prejudice" provisions set forth in Section 18 of the Agreement. The Court expressly confirms the provisions of Section 18 of the Settlement Agreement, and incorporates them herein as if fully set forth.

### F.      Indemnification

In the Settlement Agreement, the parties agreed that GM will indemnify the IUE-CWA, and its officers, directors, and employees, and reimburse their reasonable attorneys' fees and expenses on the basis set forth in Section 13 of the Agreement.   The Court finds such a provision is reasonable.  *See UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *112.

### G.      Releases

In consideration of GM's entry into the Settlement Agreement, and the other obligations of GM contained therein, Class Representatives, Class Counsel, and the IUE-CWA consent to the entry of this Judgment, which will be binding upon all Class Members pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.    All of the release provisions set forth in the Settlement Agreement shall be binding upon the parties and Class Members as set forth in that Agreement.  *Id.*

### H.      Retention Of Jurisdiction

Pursuant to Section 20.C of the Settlement Agreement, the Court retains exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of the Settlement Agreement. See *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 382 (1994) (a district court retains jurisdiction to enforce a settlement agreement if it either (1) has language in the dismissal order indicating its retention of jurisdiction, or (2) incorporates the terms of the settlement agreement into the dismissal order); *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 645 (6th Cir.2001) (same); *UAW v. GM*, 2006 U.S. Dist. LEXIS 14890, at *112-13 (same).  The Court also retains jurisdiction to award fees.

## IV.    CONCLUSION

For the foregoing reasons, the Court APPROVES the parties' Settlement Agreement in all respects and as to all parties, including GM, IUE-CWA, Class Representatives, and Class Members. The plaintiffs' claims, including the claims of the Class, are hereby DISMISSED with prejudice pursuant to Fed. R. Civ. P. 41(a)(2) and 23(e)(1)(A) and (C), subject to the Court's retention of jurisdiction as stated above.

IT IS ORDERED that the Motion to Certify Class **(Docket No. 8, filed July 27, 2006)** is GRANTED.

IT IS FURTHER ORDERED that the Motion for Leave to File Brief in Excess of 20 Pages **(Docket No. 54, filed September 20, 2006)** is GRANTED.

IT IS FURTHER ORDERED that the Motion for Leave to File Excess Pages **(Docket No. 56, filed September 22, 2006)** is GRANTED.

IT IS FURTHER ORDERED that the Motion for Order Granting Final Approval of Class Action Settlement **(Docket No. 60, filed September 25, 2006)** is GRANTED.


                                              _/s/ DENISE PAGE HOOD_____
                                              DENISE PAGE HOOD
                                              United States District Judge

DATED: November 1, 2006


I hereby certify that a copy of the foregoing document was served upon counsel of record on November 1, 2006, by electronic and/or ordinary mail.

                                              S/William F. Lewis_____
                                              Case Manager